632 A.2d 163

Christopher John ALBRECHT

v.

STATE of Maryland.

No. 1122, Sept. Term, 1992.

Court of Special Appeals of Maryland.

Oct. 27, 1993.

Byron L. Warnken, Baltimore, and Gary L. Crawford, Gaithersburg (Clarke, Crawford & Bonifant, Gaithersburg, Roger W. Galvin, Washington, DC, on the brief), for appellant.

Tarra DeShields–Minnis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Andrew L. Sonner, State's Atty. for Montgomery County, Rockville, on the brief), for appellee.

Argued before MOYLAN, FISCHER and MOTZ, JJ.

MOYLAN, Judge.

A tragic accident occurred on the early evening of May 23, 1991, on Larchmont Terrace in the Gaithersburg area of Montgomery County. Rebecca Garnett, who had just been driving a car carrying a criminal suspect sought by the police for a stabbing, was killed when a shotgun held by Officer Christopher J. Albrecht, the appellant, accidentally discharged. The issue is whether that constituted criminal conduct on the part of the officer. Officer Albrecht was indicted on one count of manslaughter and two counts of reckless endangerment. Following a nonjury trial in the Circuit Court for Montgomery County, the trial judge found Officer Albrecht not guilty of voluntary manslaughter, guilty of involuntary manslaughter, and guilty of both counts of reckless endangerment.

Although Officer Albrecht raises a number of contentions, the pertinent one for our purposes is whether the trial court's

findings of fact supported its conclusion of law that the defendant was guilty of involuntary manslaughter of the gross criminal negligence variety and of reckless endangerment under Md.Ann.Code art. 27, § 120(a).

### The Facts

On May 23, 1991, Officer Albrecht, along with Officer Marvin Thomas, responded to the stabbing of Timothy Fair in the area of Fairhaven Drive. One witness, Barbarette Budd, identified the assailant as having been Darnell Budd. She described to Officer Albrecht how the stabbing had occurred during a fight between Timothy Fair, on the one hand, and three other young men, including Darnell Budd, on the other. The stabbing victim, before being transported to the hospital, told the officers that he had known his three assailants prior to the attack and that they were drug dealers. Another witness, Charlotte Daniels, reported that, immediately following the stabbing, Darnell Budd and the other two had left the area in a car driven by Rebecca Garnett. Other witnesses told Officer Albrecht that the three suspects were known to be involved with guns and that the officer should "watch out" because there might be a gun in the car driven by Rebecca Garnett. Other witnesses told the officers that the three "boys" might have been involved in a robbery. In any event, both officers were alerted to the fact that the three suspects, including Darnell Budd, might well be armed.

As the officers were continuing with the interview of witnesses at the crime scene, Barbarette Budd saw the green Chevrolet carrying the suspects speed by. She yelled, "[T]here goes the car." Officers Albrecht and Thomas ran to their respective police cruisers and gave brief chase, at high speeds and with sirens and dome lights activated, but lost the suspect vehicle at the outset. After a brief search of the general surrounding neighborhood, however, Officer Albrecht located the vehicle and the suspects on Larchmont Terrace. The car was backed into a parking space. Both Darnell Budd and Rebecca Garnett were standing outside the vehicle. When they spotted Officer Albrecht approaching, they moved

toward the car as if to leave. Darnell Budd was on the passenger side and Rebecca Garnett went toward the driver's door. Officer Albrecht also noticed a third individual, later identified as James Littlejohn, crouched in the back seat. Officer Thomas, who was in radio contact with Officer Albrecht while also searching the neighborhood, arrived at Larchmont Terrace a matter of seconds behind Officer Albrecht.

It is the fraction of a minute following Officer Albrecht's spotting of the suspect vehicle on Larchmont Terrace that is critical to the outcome in this case. We shall reduce the narration to slow motion in an attempt to capture the nuances of those critical seconds. The testimony of Officer Marvin Thomas, who arrived on the scene seconds after Officer Albrecht, depicts the mind-set of both officers as they approached the suspect vehicle. Officer Thomas was on his car radio with the dispatcher, and the entire conversation was captured on audio tape. Officer Thomas asked the dispatcher to give him a "10–3" so that we could "make sure these clowns aren't armed." The officer described that a "10–3" clearance means that no other cars will be talking on the airwaves and that the channel of communication will be kept open exclusively for the officers on the action end of the "10–3." Officer Thomas explained:

> "A 10–3 means there are to be no other cars talking on the air so that it's clear in case anything happens we can get on the air and ask for assistance, immediate assistance. *It's usually when you're in a high danger, or there's a high chance that the situation can escalate to very dangerous."* (emphasis supplied).

The officers were concerned that the suspects being stopped might be armed and dangerous. Again, Officer Thomas explained:

> "Well, when I turned on Larchmont I was informed by Officer Albrecht that he had the vehicle. We still—There was a question as to not only was this the vehicle and were they the people we were looking for, but there still was a

question about weapons. So, with him there, my concern was to get there as quickly as possible to make sure that at least there was two of us to confront them. So, yes, I came very quickly."

Officer Thomas was familiar with that general area of the Germantown district. He was asked specifically whether he considered "Larchmont Terrace and its environment to be a particularly dangerous or hostile area." He replied, "Larchmont, in itself, has quieted down, but at one point it was."

In the section where this confrontation occurred, Larchmont Terrace is a wide paved area, serving, in effect, as both a street and a parking lot for some townhouses that face on it. It is wide enough to accommodate parking perpendicular to the curb rather than parallel to it. When Officer Albrecht spotted the suspect green Chevrolet, it was backed up to the curb on Larchmont Terrace facing outward. Rebecca Garnett, who had been driving, had gotten out of the driver's door and was standing off to the right of the vehicle from Officer Albrecht's point of view as he approached. Utilizing standard procedure, Officer Albrecht brought his police cruiser to a stop in front of and to the right of the suspect vehicle and facing in a direction so that he could use the vehicle as a shield. His focus was initially and primarily on Rebecca Garnett.

Officer Thomas moved his police cruiser into a position in front of the suspect vehicle and off to its left, as he was facing it. Darnell Budd had gotten out of the front passenger seat and was standing off to the left, as the officers viewed the scene. Both officers also observed James Littlejohn, still in the suspect car and apparently crouched in the rear seat. It turned out that James Littlejohn was blind and posed no threat to the officers, but they did not know this during the initial confrontation.

Officer Thomas explained that the position taken by the two officers and their vehicles was pursuant to "a specific procedure" utilized when making a "felony stop" of potentially armed and dangerous suspects in or near a motor vehicle. He

also explained why he initially drew a handgun from his holster rather than unlimber a shotgun. The choice of weapons is discretionary with an officer:

> "The vehicles basically are set up the way that we have the cars parked there, Your Honor. In a felony stop you can use a shotgun or you can use a handgun. There is no set guidelines. It's whatever the officer decides to use. You use the vehicle for cover and you bring the suspect away from their vehicle, back to your position. You secure them, handcuff them, and get them so that they're safe. You search them. And once everyone is away from the car, secured and searched, then you approach the vehicle cautiously and check the vehicle and make sure there is no one else in it and then you check it for a weapon."

As Officer Albrecht got out of his police cruiser, he released his shotgun from its rack. He yelled at all three suspects, "Stop! Freeze!" As he did so, he placed a shotgun shell in the chamber and "racked" the gun into a final stage of firing capability. He leveled the gun at Rebecca Garnett. He testified that he then mentally "checked off" Rebecca Garnett as not being an immediate threat. He intended to swing the shotgun to its left in order to bring it to bear on Budd and Littlejohn. As he started the move, the shotgun discharged. The blast struck Rebecca Garnett in the chest, killing her almost immediately.

When Officer Thomas pulled his vehicle to a stop, he could see that Officer Albrecht was controlling the driver's side of the suspect vehicle and the person of Rebecca Garnett. Officer Thomas's position enabled him to direct his attention to the passenger side of the vehicle and Darnell Budd. He was starting to get out of his police cruiser with his service revolver drawn when he heard the "racking" of Officer Albrecht's shotgun. It was the "racking" sound that persuaded him to reach immediately back into his own cruiser and to take from the "rack" his own shotgun. It was at that moment that he heard the discharge of Officer Albrecht's weapon.

Initially, neither Officer Albrecht nor Officer Thomas realized that Rebecca Garnett had been hit by the shotgun blast. They both described her as seeming to sit down on the sidewalk as if complying with the orders to "stop" and to "freeze." When the shotgun discharged, it "jumped" in Officer Albrecht's grip. He testified that he lost his grip on the shotgun when it discharged. Shortly thereafter at the station house, he was discovered to have a bruise on his right bicep where the shotgun had hit him as part of its backfire. His immediate reaction to having lost his grip was to regrip his weapon and "rack" a second round into the chamber. Both he and Officer Thomas then proceeded to arrest Budd and Littlejohn. It was then that Officer Albrecht turned his attention to Rebecca Garnett and realized that she had been shot. As he began to administer CPR to her, Officer Thomas went to his police radio to send a "10–50" signal—an "officer in trouble" call. The police department audio tape revealed that between the first "10–3," when the officers were first approaching the suspect vehicle, and the "10–50" call, fifty seconds had elapsed.

Sergeant Joseph Mattingly was one of the first police officers to respond to the "10–50." When he asked Officer Albrecht what happened, the officer replied, "I shot her. I really fucked up. It was an accidental discharge." At trial, a number of officers testified that Officer Albrecht was extremely emotional after the shooting. They variously described him as "kind of in a daze," "very upset" and in a "semi-state of shock." Officer Albrecht's own supervisor, Sergeant Douglas McFee, arrived on the scene and took him to the offices of the Fraternal Order of Police two miles away. On arriving, Officer Albrecht ran into the bathroom and vomited. He kept telling Sergeant McFee repeatedly that he "did not intend to shoot the girl . . . it was an accident." Both testimony and photographs were introduced as to the bruising on Officer Albrecht's right bicep.

The testimony of Officer Joseph Niebauer, of the Technical Services Section, was of great significance on the question of the accidental nature of the discharge of the shotgun. At the station house, shortly after the accident, he examined Officer

Albrecht's shotgun. Initially, it "just struck [him] as being that much heavier with the additional rounds on the sling." He described his examination of the weapon:

"During conversation downstairs I had heard that the weapon had gone off whenever he was bringing it up to his shoulder. I wanted to see what would happen. So I emptied the weapon out. I had three additional rounds that we had taken out of the magazine and I masking taped them on the inside of the strap to give that, minus the one round that had been in the gun, the equal amount of weight that this strap and all these extra rounds would give you. I made sure the weapon was empty. I closed the chamber. Folding the weapon, I brought it up to my shoulder and it went off before I got it up to my shoulder. It clicked."

He elaborated:

"Just folding the weapon with the additional rounds on it, the magazine closed, the gun cocked, holding it, brought it up to my shoulder and it went off just from the sheer pressure and exertion I was using to fold the gun. Folding the gun, in a like fashion, when I brought it up it went off."

Testimony also established that Officer Albrecht's shotgun had been fitted with an approved bandolier that held fifteen extra rounds of ammunition. Courtroom demonstrations showed how the added weight of the bandolier and ammunition made the weapon more likely to discharge accidentally. A firearms instructor, Officer Michael McNally, testified that the bruise to Officer Albrecht's bicep was consistent with the discharge of the weapon while the butt of the gun was against the bicep rather than being properly positioned at the shoulder.

It is not necessary to catalogue further the evidence supporting the conclusion that the shotgun discharged accidentally and that Officer Albrecht did not intentionally shoot and kill Rebecca Garnett. The trial judge was not persuaded that the discharge of the weapon had been intentional. The critical fact finding of the trial judge as to the unintentional nature of the shooting was:

"It is my belief that the Defendant's shotgun was aimed at Becky Garnett, as well as the others in the immediate vicinity of the green automobile, that Ms. Garnett's confused reaction to Defendant's commands startled him into pulling the trigger."

The only issue for review is whether the evidence was legally sufficient to support a finding of gross criminal negligence. Such a finding, as the trial judge properly assumed, would be the indispensable predicate to support both the conviction for involuntary manslaughter and the two convictions for reckless endangerment. The trial judge observed in this regard:

"The question in this case, the overriding question in this case, both in terms of the manslaughter and reckless endangerment charges, is whether the conduct overall of the Defendant was reckless, and I will assume that the same measure of recklessness, that it be a gross and wanton deviation from reasonable conduct, would apply to both the manslaughter and the reckless endangerment charges."

### The Verdicts Being Reviewed

Officer Albrecht's primary appellate contention is that the three verdicts of guilty against him—one for involuntary manslaughter and two for reckless endangerment—were clearly erroneous, in that the evidence was not legally sufficient to support them. As we undertake that review, we would point out that this opinion will only be understood by those who are meticulously careful to isolate precisely what is here being reviewed and what is not being reviewed. A single set of facts, a single state of mind on Officer Albrecht's part served as the predicate for all three convictions. Our review of the legal sufficiency of the evidence, therefore, is effectively reduced from three reviews to a single review. Our reference to *actus reus* and to *mens rea* will be in the singular.

We are not reviewing whether Officer Albrecht intentionally triggered the shotgun blast that killed Rebecca Garnett. After hearing two weeks of testimony, the fact-finding judge

exonerated Officer Albrecht of that. That question has been removed from the case and is not in issue for purposes of our review. The undisputed finding of the trial judge in that regard was that the firing of the fatal shot was unintended:

> "There has been a welter of evidence in this case, and there is no need to recount it all. One fact is clear beyond dispute—*the Defendant fired a shot that caused the death of Rebecca Garnett. Was it an intended or unintended act?* At a minimum, in order for the State *to proceed with the charge of voluntary manslaughter, the State would have to convince that the act was intended,* and I may say that as to the matter of voluntariness, I have sufficient doubt that *I cannot find the Defendant guilty of voluntary manslaughter and I do not."* (emphasis supplied).

That verdict did more than dispose of the voluntary manslaughter charge. It also reduced significantly the possible predicate for reckless endangerment. The reckless endangerment convictions cannot, following that verdict, be supported by the theory that Officer Albrecht recklessly fired his shotgun under circumstances where innocent civilians were possibly in his line of fire. The trial judge was not persuaded beyond a reasonable doubt that the firing of the shotgun had been intentional. A conviction for reckless endangerment, therefore, can only be supported by the theory that the very aiming of the shotgun, with innocent civilians possibly in the line of fire, *ipso facto* constituted reckless endangerment. Consistent with the acquittal for voluntary manslaughter, the trial judge's verdict of guilty on the reckless endangerment counts was predicated not on the act of *firing* the shotgun but on the antecedent act of *pointing* the shotgun:

> "It is also clear to me that the issue of recklessness aside, *Defendant's bringing to bear of a loaded shotgun in the direction of the green automobile* created a substantial risk of death or serious physical injury to Rebecca Garnett, James Littlejohn and Darnell Budd, and, whether Defendant knew it or not, to Tequila Frazier on her tricycle, Travell Dumar playing nearby, and Carroll Walker standing on the front walk of a friend." (emphasis supplied).

This high-profile two-week trial was meticulously well tried by the trial judge, by the assistant state's attorney, and by both defense counsel. The testimony consumes approximately 1,750 pages of transcript. For purposes of this review, however, much of that testimony is no longer relevant. The expert opinions on such issues as the trigger pull, the shot pattern, the effect of stress, the manufacture of the Remington 870 shotgun, the effect of the weight of the bandolier on possible accidental discharge, were all very relevant at trial but have now become largely irrelevant for purposes of this review. They dealt with the issue, then very much in dispute but now resolved in the appellant's favor, of whether Officer Albrecht fired the shotgun intentionally. Irrelevant also, at this stage, are all of the police department directives pertaining to the use of deadly force, to the extent to which the phrase "deadly force" contemplates the actual *firing* of a weapon and not the mere *pointing* of a weapon. Quite aside from the numerous expert witnesses and departmental directives, the predominant thrust of the entire case both by the State and by the defense dealt with that question of whether Officer Albrecht pulled the trigger intentionally. The primary focus of the argument from both sides of the trial table was on that question of whether the firing was intentional. That issue, however, has now been resolved and full attention must turn to what was, at trial, the secondary issue—the State's backup position—that even if the firing of the shotgun was accidental, the antecedent acts of unlimbering, "racking," and aiming the shotgun were so grossly criminally negligent—so recklessly and wantonly life endangering—as to support verdicts of guilty in any event.

Although the finding of the trial court was that the actual pulling of the trigger was accidental, a nervous twitch or an involuntary muscular spasm as a result of being "startled," the intentional, antecedent actions for which Officer Albrecht was responsible included the actual aiming of the shotgun at Rebecca Garnett:

> "It is my belief that the Defendant's shotgun was aimed at Becky Garnett, as well as the others in the immediate

vicinity of the green automobile, that Ms. Garnett's confused reaction to Defendant's commands startled him into pulling the trigger."

■ In analyzing the antecedent conduct, without which the accidental firing of the weapon could not have had its fatal consequence (in the case of Rebecca Garnett) or its life-endangering consequences (in the case of others who might have been in the line of fire), the trial judge, correctly in our judgment, equated the *mens rea* of grossly negligent involuntary manslaughter with the *mens rea* of reckless endangerment:

"The question in this case, the overriding question in this case, both in terms of the manslaughter and reckless endangerment charges, is whether the conduct overall of the Defendant was reckless, and I will assume that the same measure of recklessness, that it be *a gross and wanton deviation from reasonable conduct,* would apply to both the manslaughter and the reckless endangerment charges, although we did not discuss that I will assume that they are equivalent."   (emphasis supplied).

■ We further agree with the trial judge that, in assessing what is "a gross and wanton deviation from reasonable conduct," the standard of reasonableness is that of a reasonable police officer similarly situated:

"In evaluating the reasonableness of the Defendant's conduct throughout this case, *his actions must be judged from the perspective of a reasonable officer on the scene,* rather than with 20/20 vision of hindsight.   The reason that is exacted of him is not the reason of the morrow, it is reason fitted and proportioned to the time and event."   (emphasis supplied).

Under almost all circumstances, the gratuitous pointing of a deadly weapon at one civilian by another civilian would almost certainly be negligence *per se,* if not gross negligence *per se.* A police officer, on the other hand, is authorized and, indeed, frequently obligated to threaten deadly force on a regular basis.   The standard of conduct demanded of a police officer

on duty, therefore, is the standard of a reasonable police officer similarly situated. We agree fully with the trial judge's articulation of the standard against which Officer Albrecht's conduct must be measured:

"I have no doubt that Christopher Albrecht was attempting to do right on the occasion in question and that he acted at all times without malice in his heart. But again, *the standard is one of a reasonable officer similarly situated.*" (emphasis supplied).

The utilization of that standard of a reasonable officer, therefore, requires us to review closely the testimony of the various instructors at the police training academy and the various working officers in order to see what the actual evidence in this record establishes, in order to arrive at some conclusion or some consensus as to what "a reasonable officer similarly situated" would probably have done in Officer Albrecht's place. Only with a determination of the "standard" will we be equipped to determine whether Officer Albrecht's act of aiming a shotgun at Rebecca Garnett constituted "a gross and wanton deviation" from such a standard.

When, after recounting the pertinent facts in this case, we turn to a discussion of the applicable law, we shall examine that quality of mind required to elevate ordinary negligence to gross criminal negligence. We shall try to define that special component of recklessness that is something above and beyond negligence. In terms of the facts to which we will apply that legal analysis, the verdicts that have already been rendered in this case define and limit that factual universe.

■ As we have said, the issue before us is not whether Officer Albrecht pointed the shotgun at Rebecca Garnett and then intentionally pulled the trigger. He has been exonerated of that. He was found not guilty of voluntary manslaughter, based on the trial judge's inability to find that the firing of the gun had been an intended act. We shall accept, therefore, as a given, that the trigger was never intentionally pulled and that the discharge of the shotgun was accidental. The issue at this stage, rather, becomes one of whether Officer Albrecht's

conduct in unlimbering the shotgun, in "racking" a shell into the chamber, and in pointing it at Rebecca Garnett in the first instance was itself a criminal act. If it was, it would be equally blameworthy and reprehensible whether the gun went off and Rebecca Garnett was killed or not. If, on the other hand, the acts of unlimbering and pointing the weapon were not in and of themselves criminal, the unintended death of the victim will not make them so. As *Mills v. State*, 13 Md.App. 196, 200, 282 A.2d 147 (1971), *cert. denied*, 264 Md. 750 (1972) pointed out:

> "[W]hether an accused's conduct constituted *gross negligence must be determined by the conduct itself and not by the resultant harm.* Nor can criminal liability be predicated on every careless act merely because its carelessness results in injury to another." (citations omitted) (emphasis supplied).

As difficult as it is to do when tragedy results and community emotions run high, we must keep our exclusive focus not on the discharge of the shotgun and its deadly consequence but only on the act of loading and aiming that shotgun in the first instance. We must determine whether the trial judge's conclusions of law can be supported by his findings of fact. We must ask whether the evidence could support a finding that the conduct of Officer Albrecht would have been a criminal act of reckless endangerment even if the gun had never gone off and even if no one had ever been hurt. If, ten seconds after Officer Albrecht "racked" his weapon and leveled it at Rebecca Garnett, Officer Marvin Thomas had leveled his shotgun at Darnell Budd, could that act also have been found to have been equally criminal even if his weapon had never discharged? In all circumstances such as those prevailing in this case, might a police officer's pointing of a loaded weapon at a suspect be found to be criminal *per se*? We must freeze in time the split second before the gun went off and inquire as to whether, at that instant, Officer Albrecht could have been found guilty of gross criminal negligence and reckless endangerment or not.

## The Law

Chief Judge Murphy (now Chief Judge of the Court of Appeals), in *Mills v. State,* 13 Md.App. 196, 282 A.2d 147 (1971), *cert. denied,* 264 Md. 750 (1972), provided the best analysis we have yet had of the state of mind necessary to render one guilty of involuntary manslaughter of the gross-criminal-negligence variety. He described it, 13 Md.App. at 200, 282 A.2d 147:

> "It is well settled in this State that where a charge of involuntary manslaughter is predicated on negligently doing some act lawful in itself, *the negligence necessary to support a conviction must be gross or criminal, viz., such as manifests a wanton or reckless disregard of human life."* (emphasis supplied).

That state of mind of recklessness is the essentially indistinguishable *mens rea* for a violation of Art. 27, § 120(a) as well. The reckless endangerment statute provides, in pertinent part:

> "Any person who recklessly engages in conduct that creates a substantial risk of death or serious injury to another person is guilty of the misdemeanor of reckless endangerment and on conviction is subject to a fine not exceeding $5,000 or imprisonment not exceeding 5 years or both."

Md.Ann.Code art. 27, § 120(a) (1992).

Although some states have reserved the phrase "reckless and wanton" for second-degree murder of the depraved-heart variety, Maryland early on decided that the gross criminal negligence necessary for a conviction for involuntary manslaughter required that extreme degree of indifference to the human consequence of one's actions that can only be described as wanton. The Court in *Allison v. State,* 203 Md. 1, 5, 98 A.2d 273 (1953) pointed out that "even an unintentional killing may constitute the crime of manslaughter if it is due to *a wanton and reckless disregard of human life."* (emphasis supplied). *See also Hughes v. State,* 198 Md. 424, 432, 84 A.2d

419 (1951); *Neusbaum v. State,* 156 Md. 149, 155, 143 A. 872 (1928).

In *Johnson v. State,* 213 Md. 527, 531, 132 A.2d 853 (1957), Chief Judge Brune focused on the subject of gross criminal negligence. He reviewed the earlier Maryland decisions of *Hughes v. State,* 198 Md. 424, 84 A.2d 419 (1951); *Duren v. State,* 203 Md. 584, 102 A.2d 277 (1954); *Thomas v. State,* 206 Md. 49, 109 A.2d 909 (1954); *Clay v. State,* 211 Md. 577, 128 A.2d 634 (1957); and *Lilly v. State,* 212 Md. 436, 129 A.2d 839 (1957), and concluded:

> "These cases have uniformly recognized that in order to constitute gross negligence, the conduct of the defendant must be such as to amount to *a wanton or reckless disregard for human life* or for the rights of others." (emphasis supplied).

213 Md. at 531, 132 A.2d 853.

*See also Chase v. Jenifer,* 219 Md. 564, 569, 150 A.2d 251 (1959); *Craig v. State,* 220 Md. 590, 597, 155 A.2d 684 (1959); *Palmer v. State,* 223 Md. 341, 352, 164 A.2d 467 (1960); *Morris v. State,* 4 Md.App. 328, 332–333, 242 A.2d 582 (1968); *McFadden v. State,* 1 Md.App. 511, 517, 231 A.2d 910, *cert. denied,* 247 Md. 741 (1967).

In *State v. Gibson,* 4 Md.App. 236, 242, 242 A.2d 575 (1968), *aff'd,* 254 Md. 399, 254 A.2d 691 (1969), Chief Judge Murphy had on an earlier occasion looked at the quality of the negligence necessary to support a charge of involuntary manslaughter:

> "It is well settled in this State that where a charge of involuntary manslaughter is predicated on negligently doing some act lawful in itself ... *the negligence necessary to support a conviction must be gross or criminal, viz., such as manifests a wanton or reckless disregard of human life."* (footnote omitted) (emphasis supplied).

*See also Rolfes v. State,* 10 Md.App. 204, 207, 268 A.2d 795 (1970).

■ Both common law manslaughter and the statutory crime of manslaughter by automobile involve the same quality of gross criminal negligence. In *State v. Kramer*, 318 Md. 576, 590, 569 A.2d 674 (1990), Judge Orth described gross negligence as conduct that is nothing short of being of an "extraordinary or outrageous character":

> "In each case, as a matter of law, the evidence must be sufficient beyond a reasonable doubt to establish that the defendant was *grossly negligent, that is,* that he had *a wanton or reckless disregard for human life....* Only conduct that is of extraordinary or outrageous character will be sufficient to imply this state of mind.* Simple negligence will not be sufficient." (emphasis supplied).

*See also Nast v. Lockett,* 312 Md. 343, 350–351, 539 A.2d 1113 (1988); *Abe v. State,* 230 Md. 439, 440, 187 A.2d 467 (1963).

Albeit in the context of a trespass case, Judge Horney in *Griffin and Greene v. State,* 225 Md. 422, 429, 171 A.2d 717 (1961), *rev'd on other grounds,* 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964), provided for Maryland a general definition of the word "wanton":

> "Although there are almost as many legal definitions of the word 'wanton' as there are appellate courts, we think the Maryland definition, which is in line with the general definition of the word in other jurisdictions, is as good as any. In *Dennis v. Baltimore Transit Co.,* 189 Md. 610, 56 A.2d 813 (1948), as well as in *Baltimore Transit Co. v. Faulkner,* 179 Md. 598, 20 A.2d 485 (1941), it was said that the word 'wanton' means 'characterized by extreme recklessness and utter disregard for the rights of others.' "

Just as Chief Judge Murphy effectively wrote the Maryland law on the subject of involuntary manslaughter of the gross-criminal-negligence variety in *Mills v. State,* 13 Md.App. 196, 282 A.2d 147 (1971), *cert. denied,* 264 Md. 750 (1972), he performed a similar service in *Minor v. State,* 326 Md. 436, 605 A.2d 138 (1992), for the then three-year-old Reckless Endangerment Statute. (Enacted as 1989 Md.Laws 969 and now codified as Md.Ann.Code art. 27, § 120 (1992).) As with

grossly negligent manslaughter, it is the allegedly reckless conduct itself that is in issue and not the harm that flows from it. For present purposes, it is not the discharge of the shotgun or the death of Rebecca Garnett that is being assessed; the focus is exclusively on the antecedent action of unlimbering, "racking," and aiming the shotgun. As Chief Judge Murphy pointed out:

> "It is readily evident from the plain language of § 120(a) that it was enacted to punish, as criminal, reckless conduct which created a substantial risk of death or serious physical injury to another person. It is the *reckless conduct and not the harm caused by the conduct,* if any, which the statute was intended to criminalize." (emphasis supplied).

326 Md. at 442, 605 A.2d 138.

As Judge Bishop pointed out for this Court in *Minor v. State,* 85 Md.App. 305, 314–315, 583 A.2d 1102 (1991), the language of the new Maryland statute employs substantially the language of § 211.2 of the Model Penal Code. Although Maryland has not adopted the Model Penal Code itself or its definition of "reckless," a part of that definition, contained in § 2.02(2)(c), was tracked, almost word for word, by the Court of Appeals in *Minor v. State,* 326 Md. at 443, 605 A.2d 138.[1] Model Penal Code and Commentaries § 2.02 (Official Draft and Revised Comments 1985), defines "recklessly" as follows:

> "A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known

---

1. Where Maryland and the Model Penal Code may have parted company is over the subjective versus the objective standard for determining recklessness. Whereas the Model Penal Code, with its reference to the conscious disregard of risk, may imply a subjective standard, Maryland has unequivocally adopted an objective standard. As *Minor v. State* pointed out, 326 Md. at 443, 605 A.2d 138, "[G]uilt under the statute does not depend upon whether the accused intended that his reckless conduct create a substantial risk of death or serious injury to another."

to him, its disregard involves *a gross deviation from the standard of conduct that a law-abiding person would observe* in the actor's situation." (emphasis supplied).

In *Minor v. State,* 326 Md. at 443, 605 A.2d 138, Chief Judge Murphy set out the test for recklessness in this state:

"The test is whether the appellant's misconduct, viewed objectively, was so reckless as to constitute *a gross departure from the standard of conduct that a law-abiding person would observe,* and thereby create the substantial risk that the statute was designed to punish." (emphasis supplied).

The State attempts to establish such a "gross departure from the standard of care exercised by a reasonable person" by asserting that the very act of pointing a loaded weapon at another constitutes such a gross departure *per se* and establishes thereby the necessary recklessness. The State cites four cases for that proposition: *People v. Andersch,* 107 Ill.App.3d 810, 63 Ill.Dec. 551, 557, 438 N.E.2d 482, 488 (1982); *State v. Barberousse,* 458 So.2d 569, 572, *aff'd,* 480 So.2d 273 (La.Ct.App.1986); *Navarro v. State,* 433 So.2d 1011, 1012 (Fla.Dist.Ct.App.1983); *People v. Schwartz,* 64 Ill.App.3d 989, 21 Ill.Dec. 765, 770, 382 N.E.2d 59, 64 (1978). None of those cases is remotely apposite. Each is a situation where a civilian without any occupational mandate pointed a loaded weapon at another civilian. None of those cases involved as a defendant a police officer, who is empowered to carry a weapon and, under many circumstances, to point it and even to use it.

When an officer of the law is charged with having used excessive force, the reasonableness of his conduct will be assessed from the perspective of a reasonable police officer in similar circumstances. *Wilson v. State,* 87 Md.App. 512, 520–521, 590 A.2d 562 (1991); *Davis v. Muse,* 51 Md.App. 93, 441 A.2d 1089 (1982). The *Wilson* opinion, 87 Md.App. at 521, 590 A.2d 562, quoted with approval, in this regard:

"The reasonableness of the force used must be judged in the light of the circumstances as they appeared to the officer at

the time he acted, and the measure is generally considered to be that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary under the circumstances. The officer has discretion, within reasonable limits, to determine the amount of force which the circumstances require, and he is not guilty of wrong unless he arbitrarily abuses the power confided in him. Moreover, it is presumed that he acted in good faith." (footnotes omitted).

5 Am.Jur.2d *Arrest* § 81 (1962).

In the context of assessing the Fourth Amendment reasonableness of a police officer's use of force, *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989) observed:

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

To assess Officer Albrecht's conduct, therefore, in terms of unlimbering, "racking," and aiming a shotgun—not in firing it—, against the norm of a reasonable Montgomery County police officer, we must examine the evidence to see what it reveals with respect to that norm. What are Montgomery County officers taught as to proper procedures that may be used in such circumstances? What does the evidence reveal as to the actual conduct of other Montgomery County officers in similar circumstances?

### Legal Sufficiency

■ Utilizing those standards, we see no evidence in this case from which a fact finder could have been persuaded beyond a reasonable doubt that there was on the part of the appellant such gross criminal negligence so as to demonstrate a wanton disregard for human life. Nor do we see any gross deviation or gross departure from the standard of conduct that a reasonable police officer would employ in similar circumstances. Rebecca Garnett suffered a tragic death. The appel-

lant was unquestionably the homicidal agent. For purposes of our review, however, it is a given that the discharge of the gun was accidental. The only issue before us is whether the pointing of the gun at Rebecca Garnett was, in and of itself, a criminal act. Given the demanding definition of gross criminal negligence, we see no evidence that could rationally satisfy that requirement.

Utilizing the standard of the reasonable police officer, we assess the circumstances from the point of view of a police officer who is looking for one or more culprits in a stabbing, who has been told that the two or three young men involved are drug pushers, who has been told that the subjects may be armed, who has just engaged in a high-speed chase, and who has just located the suspect car with three apparent occupants. The officer is trained to use his own police cruiser as a shield when he confronts a potentially dangerous situation and to make sure the target area is neutralized before proceeding to a calmer inspection. With respect to any reasonable officer in such a circumstance, we have to conclude that his adrenaline would be pumping, his heart would be pounding, and he would be fearful for his own life. When he orders suspects to "freeze," he is intensely sensitive to compliance with that order.

Officer Thomas was watching Darnell Budd even as the appellant was watching Rebecca Garnett. Officer Thomas's description of his intense concentration on any hand movement or twitching by Darnell Budd illustrates the emotion that inevitably permeates such a confrontation:

"He was facing in our direction. And it was like—It's hard to—When you're holding a gun on somebody and they're doing—they're just not standing still, Your Honor— its hard to explain, you can't say what they're doing with their hands, but their hands, they're not in their pockets, but they're not staying within clear sight. They're not to the point where he's standing there like this, so that you can see that he's not doing anything with them. But he's just like standing around doing this. And that's the scary part because very quickly we had scenarios in the Academy

where one of the instructors stood there, turned around like this, came out with a gun and fired so quickly that I didn't even have a chance to put my hand on my gun to take it out. And that's where you realize that so quick someone can come out with a weapon if you don't get them under control or get them to stop moving so that you can watch what they're doing. You can be killed, or you can be shot. And that's the part where I mean it was real scary because he wouldn't stop moving."

That was the reaction of a reasonable officer who, presumably, acted appropriately throughout the entire encounter: "You can be killed or you can be shot . . . [I]t was real scary because he wouldn't stop moving." Police officers are thrown into combat-like situations where incredible coolness is called for. It is one thing to say that occasionally a nervous instinct falls short of the ideal. It is quite another thing to say that such a lapse is criminal, calling for imprisonment in a penitentiary.

Once the possible finding of fact that the gun had been fired intentionally was declined, the only evidence of negligence of any sort that the State had was the testimony of Sergeant Robert Muehlenhort. Sergeant Muehlenhort had been assigned to the Training Academy when the appellant went through the Academy in the fall of 1987. As a faculty member, Sergeant Muehlenhort's specialty was training the recruits to handle "vehicular take-downs." He explained that that involved making arrests of people when a vehicle is involved. After going at great length through the training of the recruits in that regard, Sergeant Muehlenhort had the circumstances in the present case posed to him as a hypothetical. He was asked how he would respond. He answered that he, like the appellant here, would initially take out his shotgun:

"In a situation like that, that's pretty hard to articulate to because there are a thousand variables, you know, that we're probably missing and there's a lot of pre-knowledge that an officer would have that he could only articulate to being there. In the basic format that you're giving me,

obviously I would stop, exit my vehicle. In a situation, hypothetically, yes, I'd take my shotgun out—no question— if there's myself and others and we're in their "turf," per se, in other words we're in their area."

He further explained, however, that although he would take out his shotgun, he would not "rack" it and aim it. The State offers this as essentially its only evidence of a deviation between what the appellant did and what Sergeant Muehlenhort hypothesizes he might have done. Sergeant Muehlenhort, however, further explained why he would not have "racked" and aimed. He explained that once you aim at a single target you have tunnel vision for that target alone and lose your ability to perceive other dangers that might lie within your peripheral vision. He explained that in the hypothetical situation, he would want to pay particular attention to the second individual outside the passenger door of the car and to the third individual in the back seat. His ultimate explanation was essentially tactical in nature:

"Q: Would you rack and aim with your finger on the trigger at the girl with the bag of Fritos?

A: No, because if I racked and aimed, and I aim a shotgun, I'm going to have total tunnel vision. And aiming is like aiming at a target and I don't see anything to the right or to the left, and I need my peripheral vision because I'm looking at more than one individual.

Q: And you are concerned about your safety—

A: And my partner's."

Permitting the State every inference that can be squeezed from Sergeant Muehlenhort's testimony, it could be found that, in "racking" and aiming his weapon, Officer Albrecht departed or deviated from what Sergeant Muehlenhort would have done. That, of course, is not a meaningful test of anything. The standard from which deviation, slight or gross, is measured is not Sergeant Muehlenhort but the "norm." To see what the evidence permitted in terms of a finding as to the "norm," we must examine closely 1) the tactics taught at the Montgomery County Police Academy, 2) the testimony of the

various Montgomery County police officers as to what they have actually done in similar circumstances, and 3) the testimony of various Montgomery County police officers as to what they hypothesize they would have done had they been in Officer Albrecht's shoes. If, of ten officers testifying, one would have done "A" and nine would have done "B," "A" is not the norm. The norm is not necessarily the model or the ideal; it is what the reasonable officer *would* do. The evidence may reveal that it was Sergeant Muehlenhort's posited forbearance that was the actual departure from the Montgomery County "norm." Only when 1) the "norm" has been established and 2) some departure from that "norm" by Officer Albrecht has additionally been established, would attention turn to what the critical difference might be between a mere departure and a gross departure.

Lieutenant John Michaeljohn, the Director of Training for the Montgomery County Police Department, testified about the Montgomery County policy with respect to the use of deadly force that is taught to the candidates at the police academy. He quoted from the departmental directives to the effect that "shotguns are useful when confronting armed subjects or groups of subjects, especially in high-risk arrest situations." He testified that it is discretionary with the officer as to when to use a shotgun rather than a police revolver. He gave a general example of when the use of a shotgun would be appropriate:

"I'm talking about where the potential exists where you have information that leads you to believe that there is a potential threat on your—there could be a potential threat—on your life or the life of someone else. And a shotgun could be pulled where there probably is more that one person and you may be the only officer arriving on the scene, for example, and you have information that leads you to believe that it. could be serious and you have more than one person that you may be dealing with."

Lieutenant Michaeljohn pointed out that officers are free to act on the rumor of weapons and that if the officer has heard that a suspect has a weapon and is leaving in a car, he may

take that into account in deciding how to respond to a subsequent confrontation. He pointed out further that "the shotgun is more intimidating and you can do things with the shotgun that you can't do with the revolver." He confirmed that the cadets are taught that it is appropriate to use a shotgun when there are multiple dangerous suspects. He was asked to elaborate on the use of the word "intimidating" and the value that the very "racking" of a weapon has in effective crowd control:

"Q: All right. You've used the word 'intimidating' a couple of times, and before you got here the Judge had a couple of questions. Can you describe what you mean by 'control of the situation' and the use of intimidation, or the use of an intimidating weapon?

A: Okay. If I stood up and pointed my revolver out across here there would be an awful lot of concern. But if I stood up and racked a round from that shotgun I believe there'd be a lot of people run out of this door. And I believe the level of intimidation would be that much more and that people would really be diving for cover.

Q: What is a police officer's purpose in raising the level of intimidation?

A: To try to lessen the threat upon him or her.

Q: Is it fair to say it is to gain control of a given situation?

A: Yes, sir. Without question."

We recount the testimony about the training at the Montgomery County Police Academy and the on-the-street behavior of Montgomery County police officers at the length we do because before we can determine whether there was any legally sufficient evidence of "a gross deviation" or "a gross departure" on the part of the appellant from the standard of conduct that a reasonable Montgomery County police officer would employ, it is necessary to determine what that standard is.

Officer Leo Mangum, of the Montgomery County Training Academy, had been the instructor for the candidate class that included the appellant. He described the training that candi-

dates received in the use of the shotgun. They were run through a "shoot/don't shoot" course called a "Dueltron." The scenario simulations selected for the shotgun phase of the Dueltron training placed the candidate in the basement of Wheaton Plaza. In the simulation, an officer has been shot. The candidate with the shotgun is "going to walk point" as he leads another officer, carrying the wounded colleague, out of the area. As the candidate leads the group through the crowd with a loaded shotgun, various cardboard mockups of persons suddenly pop up at him. Some are innocent civilians; some have weapons. The candidate would swing toward each target with the shotgun but then would have to make an instantaneous decision as to whether the target was "hostile" or "nonhostile." He would shoot at the hostile targets and refrain from shooting at the nonhostile targets. He also explained how, under the stress of the shoot/don't shoot scenario, officers sometimes accidentally fired the shotgun at times into the ceiling and at times into the floor.

Officer Mangum testified that cadets are taught that, on firing a shot, their next action should always be to "re-rack" their shotguns immediately in preparation for the next encounter. Cadets are also taught that, when aiming a shotgun, they are always to aim at the center mass of the body and are to fire with the intent to kill and not to wound. Officer Mangum, incidentally, testified as a witness for the State.

Officer Michael J. McNally, an instructor at the Montgomery County Training Academy, also testified as a State's witness. He testified that five hundred Remington 870 shotguns have been distributed to the Montgomery County Police Department. He also testified that he regularly instructs the candidates to keep the safety mechanism on the shotgun disengaged. He explained that in the stress of combat, the time that it takes to disengage the safety mechanism can sometimes be fatal to an officer. He testified that, in the stress of a combat situation, officers might sometimes pull futilely on the trigger, forgetting the fact that the safety mechanism is engaged. One bit of his testimony was:

"A: I teach to carry it with it disengaged.

Q: Why?

A: If—There's been—There's some documented cases of officers being killed with a death grip on the shotgun."

Officer McNally explained that Montgomery County has no official policy on whether the safety of a shotgun should be engaged or disengaged when an officer takes it out. He explained further, however, that he recommended to his classes, including Officer Albrecht's class, that the safety should be disengaged:

"Q: Well, is it your statement that Montgomery County does not, in fact, have an official policy regarding whether the safety should be engaged or disengaged on it?

A: No. I just recommend it. It's not policy.

Q: You recommend that it be disengaged?

A: Correct."

Officer McNally was an instructor when the appellant went through the training academy. He explained to the class the advantage to be gained, from the police officer's point of view, in "racking" a shotgun:

"Q: What did you explain to your classes back in '87 about that intimidating factor that the shotgun represents, or can represent?

A: Probably one of the most intimidating sounds about the 870 shotgun is that sound when it racks, and I do refer to an incident I had when I was on the road working radar and I'd got into a chase with a car that turned out to be a stolen car. And I knew that before the suspect stopped the car. And I remember when he did stop, we had a long chase all around through Gaithersburg and he stopped over there near Lakeforest someplace. And when he got out of the car to run, I had come out of the car with the 870 and racked it and told him to halt, and he had told—the suspect told me— later that if he hadn't of heard that sound he probably wouldn't have stopped."

Thus, the crack-of-doom-like "racking" of a shotgun that may seem so frightening and so intimidating to a civilian population

is a standard police maneuver, deliberately calculated to frighten and to intimidate. At issue before us is not the propriety of such a procedure. The only thing in issue is whether Officer Albrecht was guilty of some gross deviation or gross departure from the standard procedure.

Former Sergeant Raymond Edward Griffin was a twenty-three-year veteran of the Montgomery County Police Department, a member of the first SWAT Team (Special Weapons and Tactics), the initiator of the first SAT Team (Special Assignment Team), and, from 1981 until 1988, the officer in charge of the Survival Training Program at the Police Training Academy. As we review this 1,700–page record, although other witnesses were qualified as experts on other subjects, Sergeant Griffin was the only witness to be qualified as an expert on the subject of the police use of deadly force. He had earlier qualified on four occasions as such an expert witness in federal and Maryland courts.

Sergeant Griffin described the three standard police stops of an individual as traffic stops, investigative stops, and felony stops. He explained that unlimbering and "racking" a shotgun is an acceptable standard procedure in the course of a felony stop and one as to which the stopping officer has complete discretion:

"A: Well, the departmental directive on deadly force states that whenever an officer fears for his life, or feels that the situation may be hazardous to himself—I forget the exact words. I can read it, if you like—he has, he has his own decision. He can make his own decision on whether to take the shotgun out or not."

He explained further that, as an incident of withdrawing the shotgun, the officer has the right to "rack" it:

"A: In a felony stop, if the officer has a right to have his shotgun out, he has the right to rack it and charge the weapon."

He explained yet further that that discretion includes the pointing of the shotgun at a suspect or suspects:

"Q: What else is the officer then justified in doing after racking and charging the shotgun?

A: The officer is justified in pointing the weapon at the suspects or suspect."

Sergeant Griffin also explained why it is important that an officer be pointing a gun at a suspect. The officer thus "beats to the draw" any potential adversary. If the officer does not begin to aim his weapon until after he sees an adversary's hand in motion, it is the adversary who will beat the officer to the draw, resulting in a dead or badly injured officer:

"Q: What was the rationale of the training regimen regarding the justification of pointing the weapon?

A: It is a time factor. A weapon not pointed at a suspect—An officer who is not having the weapon pointed at a suspect, will not have time to bring that weapon down if the suspect decides to pull a gun or to attack the officer, depending on where they are in the particular area.

Q: One step back again. Was the rationale—What was the rationale of the training regimen regarding the justification in racking the shotgun when the shotgun is brought out?

A: It's the same. It's—The fact is that things—violence—can erupt so quickly that an officer must be prepared as soon as possible to meet that violence. And all those things take precious time."

Sergeant Griffin was the only expert witness to testify on the subject of the police use of force. It was he who had supervised the training of Officer Albrecht at the police training academy. A full and detailed hypothetical question was put to him involving all of the circumstances leading up to the approach of Officer Albrecht to Larchmont Terrace and prevailing at Larchmont Terrace as the officer approached the suspects. It must be remembered that the conduct of Officer Albrecht that is being reviewed is not the pulling of the trigger. That was accidental. The conduct being reviewed is the unlimbering, the "racking," and the aiming of the shotgun at Rebecca Garnett. In terms of whether Officer Albrecht

deviated from or followed the Montgomery County procedures that had been taught to him at the training academy, Sergeant Griffin responded:

"Q:   First of all, is that what would be considered a felony stop?

A:   I would say so.   Yes.

Q:   In that situation would the officer be justified in utilizing the shotgun?

A:   Yes.

Q:   Would the officer be justified in racking or charging the shotgun?

.        .        .        .        .

A:   Yes.

Q:   Would the officer be justified in bringing that shotgun to bear on the suspects and the vehicle?

A:   Yes."

That does not evidence a gross deviation by Officer Albrecht from the standards of a reasonable Montgomery County police officer.

Sergeant Griffin testified finally as to the stressful nature of the encounter and the accumulated concerns that would be running through an officer's mind in the course of that encounter:

"A:   That would have been a very stressful situation.

Q:   All right.   And what are the factors, what are the factors, of this scenario or hypothetical that you would indicate would make it a very stressful situation?

A:   Well, you have, you have—A serious felony had occurred.   You had, obviously, people that were involved that were a dangerous, that had exhibited their violence, that were not opposed to resorting to a weapon to perpetrate their violence.   You have the indication, from one witness, that a suspect may have been involved in a robbery, may have been involved in drugs, may have been—I forget your exact words—but may have carried, or was known to carry a handgun—I forget your exact words—but there was a

handgun involved, or a weapon involved. Given all those facts and circumstances, plus the fact that the officers witnessed a portion of the incident on the scene, whereby they did—They observed the victim. They observed the weapon. There was blood. I assume there was, from the stabbing. The—While their investigation was ongoing, a vehicle was pointed out to them as being involved. So, then you had a situation where the officers had to get into their cars, rapidly pursue the suspects. Then they lost the suspects. Then they found the suspects again. I find all this would be tremendously stressful on those officers involved."

There is no evidence there of any gross, unjustified, reckless, and wanton disregard of human life.

Officer Scott Wiant was assigned to the Germantown district. He described the particular "beat" that included Larchmont Terrace generally and the Larchmont Terrace area specifically. He testified that that particular beat generates a greater number of serious incidents than any other beat. With particular reference to the Towncrest area, which includes Larchmont Terrace, he described it as "a high crime area." When asked particularly about it being a high crime area "up to and including May 23rd of 1991," Officer Wiant replied, "Yes, it was. And it has definitely been a high crime area since the day I came on the job." He testified that the work of the Special Assignment Teams had diminished the number of "open air drug markets" in the area but that the problem of drug use, drug possession, and drug distribution in the area had not abated. In response to a question by the trial judge about violent crime, he responded:

"Well, there are still plenty of arrests and plenty of assaults and things taking place. Still plenty of altercations where guns and knives are being taken off people. Still plenty of stabbings, and things like that, that may be drug-related but I don't think are related specifically to the fact that that's an open-air drug market."

Under cross-examination by the State, Officer Wiant remained adamant that the Towncrest/Larchmont neighborhood was the "trouble spot" of the Germantown Police District:

"A. I specifically work in the Germantown District, and I can tell you this area as opposed to other areas—Germantown, Gaithersburg, Montgomery Village. *This particular area is our trouble spot.*

Q. Is it your only trouble spot?

A. No. But *it's our major trouble spot.*" (emphasis supplied).

As the assistant state's attorney was concluding his cross-examination of Officer Wiant, an insightful exchange was triggered by an unexpected answer to the prosecutor's question. While acknowledging that Larchmont Terrace itself had improved by 1991, the officer characterized the immediately surrounding Towncrest area, through which one must pass to reach Larchmont Terrace:

"Q: It's not a war zone, is it?

A. It has been at times.

　　　.　　　.　　　.　　　.　　　.

Q. What do you mean by war zone?

A. I've been in some very serious incidents in that particular area, involving major confrontations involving serious felonies, involving *officers being assaulted,* involving what I would consider *riotous situations,* within the time period I've been on the job.

Q. Right.

A. *Very anti-police activity in that area.* I have—*My police car has been hit with bottles on occasions.* I have seen a lot in that Emory Grove community and I would say there have been times when *I would classify that*—yes—*as a war zone—*" (emphasis supplied).

In terms of establishing the standard or the norm for what Montgomery County police officers assigned to the Germantown District routinely do when making felony arrests in the Larchmont Terrace area, the most edifying information was

brought out during the searching examination of Officer Wiant by the trial judge with respect to standard police procedure:

"Q. Well, do you have some sense, in terms of these arrests that you made, *how many people were taken at gunpoint, as opposed to arrested on a warrant or simply told to give up?*

A. I would say *the majority of them were taken at gunpoint.*

Q. Shotgun-point?

A. If there were multiple adversaries, probably yes." (emphasis supplied).

The trial judge elicited that in a high crime area, the police are, candidly, "much more defensive" and, as a consequence, "much more aggressive" in terms of "taking down suspects":

"Q. Anything with regard to the use of your procedure when you effect these arrests in populated areas? Anything said to the officers about how they should proceed in that regard?

A. No.

Q. Well, given the fact that there is a fairly high level of crime, in your experience in this area, does that in any way affect the caution that needs to be shown to the law-abiding population that's there by the officer? I'm trying to determine whether anything is done differently in your area because of the high-crime incidence, with regard to how officers should operate?

A. No. I don't think anything is done differently toward the public. I think *there's a lot done differently as far as the officers are concerned because we anticipate a much greater problem—*

Q. That's what I want to hear about. Tell me what they do differently.

A. Well, I think—*I think officers are much more defensive, possibly much more aggressive, also, as far as taking down suspects.*

Q. 'Taking down,' meaning arrested?

A. Arresting, effecting arrest. We know the potential is there routinely in that particular area as opposed to outside the Courthouse here. I would handle an arrest situation much differently on Fairhaven Drive than I would at 50 Courthouse Square." (emphasis supplied).

We must repeat that our purpose in recounting at length this testimony is neither to approve nor to disapprove of police procedure. That is both beyond our competence and, at this stage, none of our business. Our single purpose is to see just what the evidence actually revealed as to standard police procedure—the norm—against which Officer Albrecht's actions must be judged. We do not postulate an ideal standard police response. Only the police can tell us that their standard response actually is. The trial judge probed for what Officer Wiant meant by the phrase "more aggressive":

"A. [M]embers of my unit, when we attempt to effect an arrest, we are aggressive and you have to be or you won't arrest the person.

Q. Be specific, if you can, by way of example? *How are you more aggressive?*

A. *Aggressive in that guns are usually drawn. I would say always drawn.* If there are multiple people, a show of force is usually—

Q. What is a show of force?

A. Multiple officers, if we can. Even officers assigned just to cover the other officers, you know, watch civilians, make sure no one else is interfering. Often times, we single out a particular dealer and we have to go through a heavy crowd, or a group of people, to get to that dealer. There's a much different course of action taken, as opposed to, you know, someone by themselves walking down the street. But as far as handling arrests differently, there, I would say, *the only thing we do different there is that we are more protective of ourselves because we know there's such a potential there for violence toward the police.*

Q. Well, is that—When you say you'd be more aggressive there, does that, in part, depend on what you think the

nature of the transaction is? Narcotics as opposed to a fight between young people? Would every take-down involve the kind of aggressive action that you've just described?

A. *If I were on patrol and I were responding to a situation non-narcotic related? Would I be aggressive in that neighborhood? Yes.*

Q. So really it's a policy then that you think would apply, regardless of the nature of the encounter?

A. *Correct. As long as it was a serious encounter of some sort.*

Q. Now, in being more aggressive toward your suspects, how does the background affect what you do? Meaning the bystanders that are around? The people who are not necessarily implicated in crime? Can you be more—

A. Obviously that's a concern.

Q. Well, how does it factor in if you are typically more aggressive in that situation using guns, and so on? How do you harmonize those two?

A. It's very difficult to. And I can only say that it changes with each circumstance, depending on where the suspects are and who's around them, and how they're interplaying with the public, *if there's public there* at all. *We generally try to isolate people, but it's often impossible* because the bad guys don't want to be isolated because they don't.

Q. *Well, what do you do when you can't isolate the bad guys?*

A. *We move in and make an arrest as best we can.*

Q. How do you? *Do you use weapons to do that?*

A. *Always.*

Q. *With people around? Innocent people?*

A. *Always.*

Q. *Loaded, pointed weapons?*

A. *Always."* (emphasis supplied).

That is telling testimony that the police do not automatically refrain from pointing loaded weapons at suspects simply be-

cause other innocent persons might be in the area. It is evidence that is very significant on the question of whether a police officer's pointing of a loaded weapon at a suspect, otherwise legitimate, could nonetheless constitute the reckless endangerment of others who might be in or near the line of fire. It is also evidence that suggests that even if firing at a suspect when innocent persons are in the line of fire might be reckless endangerment, the mere aiming of a loaded weapon at a suspect under those circumstances might not necessarily be reckless endangerment.

Officer Wiant explained further why the shotgun is a favored weapon when arresting multiple suspects:

"Q. All right. Without using jargon, tell us what you mean by 'neutralize the situation?'

A. Well, I mean to effect an arrest, if you have multiple subjects or you anticipate that a subject is armed, there probably is not a better offensive weapon than the shotgun.

Q. And why is that?

A. Because the shotgun is very powerful. It contains, you know, multiple shots when it's fired. It doesn't have to be aimed precisely. It does have to be aimed quite accurately, but not precisely as a handgun does. And it has an intimidating factor that is often used.

Q. All right. Can you explain that to Judge Messitte.

A. I know personally—myself—when I have effected arrest driving a marked police car where there were multiple people in the car, when I knew we were going to arrest them like for drug dealing, and several dealers were to get into a car, and very often I was assigned to stop the car and I was by myself due to Officer limitations—other officers were arresting other people—very often—always—if there were multiple people in the car and I knew they were going to be arrested, I would take out the shotgun, rack it and order everybody to put their hands up. It's just a very intimidating gun, and I think there's a big mystique about the shotgun. People really don't know what it's capable of. It's not capable of as much as the public thinks it is, but as

long as they think that, that's the purpose of it, I think. For the police to show and produce and rack a shotgun, it's a very intimidating weapon.

Q. Why would you rack it?

A. Well, you have to rack it to load it. If you don't rack it, then it's useless.

The Court: Do you distinguish between showing and racking and pointing?

The Witness: Well, if you remove the shotgun, there's not sense removing it if you're not going to rack it, because it's unloaded.

The Court: All right.

The Witness: It would be like pulling your handgun and holding your bullets in your left hand. And then if you need it loaded, you can't do that. You have to rack it as soon as you pull it."

Three current Montgomery County officers and one deputy sheriff, all of whom had been classmates of Officer Albrecht at the police training academy, also testified. Deputy Sheriff John Kenworthy testified as to what the candidates had been taught in terms of handling a felony stop:

"Q: And regarding that training, were you instructed in the area of felony stops?

A: Yes, sir.

Q: Were you instructed about the use of a shotgun in the context of a felony stop?

A: Yes, sir.

Q: Regarding the shotgun, what was your instruction as to whether or not, when the shotgun is with you in your cruiser on the job, as to whether the safety should be engaged or disengaged?

A: The shotgun was supposed to have the safety off at all times in the cruiser.

Q: And what was your instruction regarding the permissibility of use of a shotgun in the context of a felony stop?

A:   It was up to the discretion of the officer to pull out the shotgun when required, when the officer felt that he needed it.

Q:   And when the shotgun was brought out, what, if any, instruction did you receive about charging or racking the shotgun?

A:   We were never told not to rack it.   It was up to the individual officer to either put one in the chamber or not, depending as to the incident that he was facing.

.      .       .       .       .

Q:   What, if any, training did you receive regarding the bringing to bear of that shotgun on the vehicle and/or suspect?

A:   At the time, sir, I was taught that when we pointed the shotgun, we were supposed to be behind cover and the weapon was supposed to be pointed and loaded at whoever it was that we were in fear of.

Q:   And was it to remain in that position until the threat dissipated or disappeared?

A:   Yes, sir."

Officer Donna Joan Howard was also a classmate of Officer Albrecht.   She recounted her training with respect to the use of a shotgun in the context of a felony stop:

"Q:   And were you taught that—Strike that.   Regarding the shotgun, what, if any, training did you receive regarding whether or not the safety is to be engaged or disengaged when you have it with you on duty?

A:   We do not use the safety.

Q:   All right.   What, if any, instruction did you receive about the use of a shotgun in the context of a felony stop?

A:   That when you remove the shotgun from the rack— they sit in electronic racks on the floorboard—and you take it out of the car, you rack a round in it so that it's ready to use.

Q:   In the context of a felony stop involving a vehicle and multiple suspects what, if anything, were you trained to do

regarding the use of the shotgun in that situation, after you have racked it?

A: After you've racked it?

Q: Yes, ma'am.

A: You were trained basically for the suspects, trying to contain them. Trying to get them out so you can see their hands and see what they're doing, to eliminate any possible harm to yourself. You get them under our control.

Q: In what position were you trained to hold the shotgun when you were attempting to accomplish that goal, to contain the situation?

A: Held up to your shoulder.

.    .    .    .    .

The Witness: You hold the shotgun positioned up against your shoulder and you point it.

The Court: In a pointed position?

The Witness: And you point it."

In terms of pointing the shotgun at a suspect, she elaborated:

"A: Until the situation is, in your mind, that there is no immediate danger, you're going to keep your shotgun pointed in the direction of what you feel is an immediate danger or harm to yourself.

Q: All right. In the situation involving a felony stop involving a vehicle and multiple suspects, what are some of the things that you were trained that could constitute an immediate threat?

A: The suspects not listening to any of your commands, not wanting to cooperate, not getting out of the car as you ask them to, not putting their hands high up where you can see them, not—You have to be—You want to make everything as visible to the officer as possible, so that there is no hidden surprises, no hidden anything. You know? Because a gun could be hidden almost anywhere, and that's your main concern."

Officer Howard further testified that she had been involved in ten or twelve felony stops involving vehicles and multiple suspects. She testified as to what she did on those occasions with respect to the shotgun:

"Q: And in those situations did you bring your shotgun out of the cruiser?

A: Yes, sir. I did.

Q: Did you rack a round into the chamber?

A: Yes, sir. I did.

Q: Did you point it at the suspects?

A: Yes, sir. I did."

Under the State's theory of the case, Officer Donna Howard might well have been guilty of the crime of reckless endangerment on each and every one of those ten or twelve occasions. She might further, under the State's theory of the case, have been guilty of involuntary manslaughter on any of those occasions, if the shotgun had accidentally discharged.

Officer Joyce Barrow was also a classmate of Officer Albrecht at the police training academy. She recounted her training with respect to the use of a shotgun in the course of a felony stop:

"Q: ... What was your training regarding the use of a shotgun, if any, during the course of a felony stop?

A: We are allowed to bring the shotgun out and to rack a round into the chamber and to have it ready during that felony stop in case it was needed.

Q: All right. In the context of a felony stop, what was your training, if any, regarding a felony stop that involved a vehicle and multiple suspects with regards to the pointing of the shotgun at any or all of those suspects?

A: We were allowed to point the shotgun, loaded, ready to go, at the vehicle until the situation was neutralized and everybody was accounted for and the situation was safe.

Q: Okay. Would you describe to His Honor what you mean by 'the situation was neutralized?'

A:   All suspects were out of the vehicle and under control, either arrested or searched."

She testified that she had been involved in perhaps twenty felony stops of which approximately ten had involved vehicles or multiple suspects.   She recounted her behavior on those occasions:

"Q:   And in those vehicular felony stops involving two or more suspects, have you brought your shotgun out?

A:   Yes, sir.   I have.

Q:   Have you racked your shotgun?

A:   Yes, sir.   I have.

Q:   Have you brought the shotgun to bear on the suspects and/or the car?

A:   Yes, sir.   I have.

Q:   And, in fact, have you pointed the shotgun at the suspects or the car until the situation was neutralized?

A:   Yes, sir.   I have."

Under the State's theory of the case, Officer Joyce Barrow might well have been guilty of the crime of reckless endangerment on each and every one of those approximately ten occasions.   She might further, under the State's theory of the case, have been guilty of involuntary manslaughter on any of those occasions, if the shotgun had accidentally discharged.

Officer Harold Burch was also a classmate of Officer Albrecht at the training academy.   He recounted his training with respect to the use of a shotgun in the course of a felony stop:

"A:   During a felony stop it's appropriate to take out a shotgun.   When the shotgun is taken out of the rack and removed from the vehicle you immediately put a round in the chamber.

Q:   Is that referred to as 'racking' or 'charging' the weapon?

A:   Yes, it is.

Q:   What was your training regarding pointing the weapon?

A:   The weapon is pointed at the suspects.

Q: When would it be justified then in stopping the aiming of the shotgun at a suspect or suspects?

A: When the immediate threat of the situation is gone."

He testified that during his time with the Montgomery County Police Department, he had made felony stops involving vehicles or multiple suspects on approximately ten occasions. He recounted his conduct on those occasions:

"Q: And in those felony stops involving a vehicle and/or multiple suspects, have you taken your shotgun out?

A: Yes, I have.

Q: Have you racked it?

A: Yes, I have.

Q: Have you pointed it at the suspects?

A: Yes, I have.

Q: And did you keep it pointed on the suspects until the threat, as you perceived it, dissipated or disappeared?

A: Yes, I did."

Under the State's theory of the case, Officer Burch might well have been guilty of the crime of reckless endangerment on each and every one of those approximately ten occasions. He might further, under the State's theory of the case, have been guilty of involuntary manslaughter on any of those occasions, if the shotgun had accidentally discharged.

But for the fact that the gun went off (and that was found to have been an unintended accident), there was nothing unusual in the conduct of Officer Albrecht in making this felony stop involving a vehicle and multiple suspects. There is not a scintilla of evidence to suggest any deviation or departure, let alone a gross deviation or gross departure, from the standard of conduct regularly employed by the Montgomery County Police Department in making felony stops involving vehicles and/or multiple suspects. In terms of involuntary manslaughter of the gross criminal negligence variety, there is no evidence that Officer Albrecht's conduct was even unjustified, let alone conduct evidencing a reckless and wanton disregard of human life. There was no evidence to suggest that it was

that which Judge Orth stated, in *State v. Kramer*, 318 Md. 576, 590, 569 A.2d 674 (1990), could be characterized as "conduct that is of extraordinary or outrageous character."

Officer Albrecht fully articulated what it was that caused him to unlimber, "rack", and aim his shotgun. Virtually every officer who testified stated that he or she would have done the same thing in the same situation. Officer Albrecht was in the course of making a felony stop. The standard of conduct indisputably established by the evidence was that in the course of a felony stop it is reasonable to "rack" and aim a shotgun if *either of two additional conditions are present.* One of those conditions is that a vehicle is involved in the felony stop. The other condition is that the felony stop involves two or more suspects. In this case, both conditions were satisfied.

Darnell Budd, Rebecca Garnett, and James Littlejohn were all suspects. It was Rebecca Garnett who had driven two or three males away from the stabbing scene. In view of the tight time sequence, there was every reason for an arresting officer to believe that both Darnell Budd and James Littlejohn were two of the males driven from the stabbing scene. As Officer Albrecht approached Larchmont Terrace, both Darnell Budd and Rebecca Garnett were observed by him to be returning rapidly to the green Chevrolet automobile as they observed his approach.

As we parse closely the findings of fact made by the trial judge and the reasons given by him as he rendered his verdicts, we do not mean to be critical. This difficult and lengthy trial was presided over by him with meticulous attention and deft skill at every turn. When it came to the final verdict, however, the circumstances seemed to dictate and the judge seemed to be groping, perhaps subconsciously, for a fair and equitable compromise between finding Officer Albrecht guilty of an intentional killing, on the one hand, and leaving a terrible tragedy totally unredressed, on the other hand. Ironically, *a compromise between those two extremes is the ver-*

dict that is the most difficult to sustain doctrinally. Sometimes, there is no middle ground.

Had Officer Albrecht been found to have fired at Rebecca Garnett intentionally, a verdict of voluntary manslaughter would have posed little difficulty in terms of the legal sufficiency of the evidence to sustain it.[2] The trial judge was not honestly persuaded that such an intent was in Officer Albrecht's mind, however, and properly refrained from basing a verdict on such a theory. The difficulty posed for the remaining verdicts, however, is that the verdict on the voluntary manslaughter count that Officer Albrecht did not intentionally pull the trigger, once made, was in the case for all purposes. No contrary finding on that particular issue, therefore, could be used to support either the gross criminal negligence necessary for involuntary manslaughter or the reckless endangerments. The reckless and wanton indifference to human life on which those verdicts had to be predicated would, therefore, have to be based only on the antecedent pointing of the shotgun and not on the ultimate firing of the shotgun.

At times, however, the final summation by the court drifted back and forth across the line that separated an unintended firing from an intended one. Significant mention was made of the directives of the Montgomery County Police Department

---

2. In other ways, a verdict of voluntary manslaughter would also have been a possible compromise, perhaps on the part of the indicting grand jury, that would be difficult to defend doctrinally. A necessary part of the *mens rea* of voluntary manslaughter is the intent to kill. Once a *prima facie* case has been made with respect to the intent to kill, however, the resultant homicide would be presumptively murder in the second degree. Presumptive second-degree murder is only possibly reduced to manslaughter when a recognizable theory of mitigation is generated by the actual evidence in the case. The only conceivable theory of mitigation here would have been that of imperfect self-defense. No such theory, however, was put forth or suggested by the evidence in the case. Under the circumstances of this case, a maximum exposure to a possible manslaughter conviction was obviously fairer and more practical than would have been an exposure to a possible murder conviction. Legal doctrines, however, do not always accommodate themselves to fairness and practicality. The lid imposed by the charging document, however, achieved the practical balance that pure legal theory might have been unable to fashion.

governing the use of force. As various representatives of that department made clear, however, the "use of force" contemplated by those directives was the actual firing of a weapon and not the antecedent drawing and aiming of a weapon. The testimony of Lieutenant John Michaeljohn was very clear on that point:

"Q: The one thing this directive doesn't talk about, though, is the display of deadly force and the circumstances under which that is appropriate, does it?

A: When you say 'the display,' are you—

Q: Of your weapon capable of exerting deadly force.

A: No, sir, it doesn't. In other words, it doesn't restrict when you can and cannot pull your weapon and be prepared to employ deadly force.

The Court: Is there another policy that does, or is that just left to the discretion of the officer?

The Witness: That's left to the discretion of the officer, Your Honor."

The directives governing the use of force became irrelevant on the residual question of the accidental discharge of the weapon.

That there was some drifting back and forth across several different doctrinal lines seems clear when we look at the single paragraph that was the heart of the court's findings with respect to the reckless and wanton disregard of human life:

"It comes then to this. In my view, Christopher Albrecht, on the evening in question, particularly given the numerous innocent persons perceived and unperceived, including Rebecca Garnett, misjudged the situation before him very badly. He relied upon a weapon customized by him in highly questionable and potentially dangerous fashion. Heedless of a situation where innocent bystanders stood at great risk of serious injury or death, he sought to capture a felon, not the most fearsome type it must be said, by causing the innocent loss of life of Rebecca Garnett and by imperiling the lives of James Littlejohn, Tequila Frazier, Travell Dumar and Carroll Walker. He did not need to do

so, given the relative lack of severity of the crime, given the lack of threats posed by the suspects, given their essential compliance with his shouted commands, particularly within the brief window of time between the time he gave the commands and the time he fired, and perhaps additionally, given the fact that he knew personally, as well as by name, the prime suspect and could take him down, as the police say, in good time without endangering the members of the community."

We must comment upon those collective fact findings, given in support of the verdicts, in a number of regards. The initial reference to the endangerment of "the numerous innocent persons perceived and *unperceived*" may have been an inadvertent slip of the tongue. Several paragraphs earlier the judge had posed the critical issue as one of "whether, under all the circumstances, Christopher Albrecht, *conscious of the risk,* acted in a grossly negligent manner, creating a high degree of risk to human life, in the one case resulting in death and in one case resulting in endangerment." One cannot be "conscious of the risk" to "persons ... unperceived."

More significant, the judge's reference to Officer Albrecht's reliance "upon a weapon customized by him in highly questionable and potentially dangerous fashion" contemplated an accidental discharge of the shotgun and sought to examine a negligent action that may have made such accidental discharge more likely. Several sentences later, however, the judge talked about Officer Albrecht's lack of a need to seek to capture a felon in a life-endangering way "given [the suspects'] essential compliance with his shouted commands, particularly given *the brief window of time between the time he gave the commands and the time he fired.*" That factual observation clearly contemplated an intentional firing of the gun. That possible rationale for the verdicts, however, had disappeared with the earlier disappearance of its factual predicate, when the court was unable to find that the firing had been intended.

The trial judge also included, without any clear differentiation, references to things that might have been a predicate for

the reckless endangerment of innocent bystanders within the very different catalogue of things that might constitute gross criminal negligence with respect to the death of Rebecca Garnett. His references to "the numerous innocent persons," to Officer Albrecht's "heedlessness of a situation where innocent bystanders stood at great risk of serious injury or death," to Officer Albrecht's "imperiling the lives of ... Tequila Frazier, Travell Dumar and Carroll Walker," and to the fact that the police knew the identity of Darnell Budd and "could take him down ... in good time without endangering the members of the community" are factors that might have pertinence with respect to reckless endangerment of bystanders but were irrelevant with respect to the involuntary manslaughter of Rebecca Garnett.

█ Assuming, for the sake of argument, that the "felony stop" of the three suspects—Darnell Budd, Rebecca Garnett, and James Littlejohn—might have been appropriate if no uninvolved bystanders had been in the possible line of fire but might have constituted the reckless endangerment *of such bystanders* had they been in that possible line of fire, any recklessness coincidentally exhibited toward the bystanders still would not have been a factor with respect to the conduct exhibited directly toward the three suspects. Gross criminal negligence in the death of Rebecca Garnett cannot be predicated on the coincidental endangerment of bystanders. Officer Albrecht's conduct *vis-a-vis* the bystanders was a mere consequence of his conduct *vis-a-vis* the suspects and not *vice versa*. The possible endangerment of bystanders was an effect of the confrontation with the suspects, not a contributing cause. Any analysis of gross criminal negligence *vis-a-vis* Rebecca Garnett, therefore, cannot treat what were, at most, coincidental consequences as contributing causes. The involuntary manslaughter of Rebecca Garnett must be premised on the reckless and wanton disregard of her life directly and not on any consequential indifference exhibited toward bystanders.

In looking exclusively at the involuntary manslaughter of Rebecca Garnett and the reckless endangerment of Rebecca Garnett, we must factor out from the trial judge's comprehensive compilation 1) those factors based on the now-estopped finding that the firing of the gun was intentional and 2) those factors dealing with the allegedly reckless endangerment of bystanders. What remains is a far more spare skeleton of the original compilation:

> "It comes then to this. In my view, Christopher Albrecht, on the evening in question, . . . misjudged the situation before him very badly. He relied upon a weapon customized by him in highly questionable and potentially dangerous fashion. . . . [H]e sought to capture a felon, not the most fearsome type it must be said . . . He did not need to do so, given the relative lack of severity of the crime . . ."

The trial judge can hardly have been suggesting that, after Darnell Budd was observed leaving the scene wherein he had stabbed Timothy Fair, it was inappropriate for Officer Albrecht and Officer Thomas to pursue the green Chevrolet and to arrest Budd. Budd had left in a car with several other individuals. The officers had been told, at the stabbing scene, that Budd and several of the males who had been with him were drug dealers. They had been told, moreover, that one or more of the fleeing group might have a gun. When the car was discovered shortly thereafter by Officer Albrecht and the suspects, who had just been in that car, were numbered at three, it cannot be suggested that this was not one of those "felony stops," involving either a vehicle *or* multiple suspects, described by the Montgomery County Police Department as one where officers should approach with guns drawn.

Although the trial judge demeaned the significance of the earlier stabbing as he used the phrase "given the relative lack of severity of the crime" and demeaned the potential danger posed by Darnell Budd as "a felon, not the most fearsome type," a stabbing of a victim in the back with a glass bottle is no less serious than a stabbing with a knife. The pictures introduced at trial showed the gaping wound that had been inflicted on the back of Timothy Fair. The wound had been

observed by Officer Albrecht and Officer Thomas. In the photograph, it is three to four inches in length and is gaping open to the width of an inch or more. It was no mere incident of some "school boy scuffle."

The trial judge also spoke of "the lack of threats posed by the suspects." When Officer Albrecht and Officer Thomas took off in pursuit of those suspects, they had been told that the two or three males in the group were drug dealers and that the group might be carrying guns. Neither Budd nor others with him could, except through hindsight, be lightly dismissed as "not the most fearsome type." In approaching a felony stop rife with that potential, that fear is not dissipated until the scene is neutralized and the hands of all suspects have been observed. The arresting officers "get the drop on" the suspects first and only lower their weapons after they are reassured that the suspects pose no danger. When Officer Albrecht saw no weapons in the hands of Rebecca Garnett, he "checked her off" in his mind and was about to direct his attention to Darnell Budd and James Littlejohn when his shotgun accidentally discharged. The larger danger had not yet dissipated. Both Officer Albrecht and Officer Thomas were concerned about the hands of Darnell Budd. Officer Albrecht described Budd as "manipulating" his shirt and preventing Officer Albrecht from getting an unimpeded view of Budd's hands. Viewing events, as we must, from the perspective of the officers on the scene, Darnell Budd cannot, as of the moment of the encounter, be lightly dismissed as "not the most fearsome type."

What is nowhere mentioned in the fact finding of the court is that James Littlejohn posed the most serious danger of all three suspects. The trial judge had earlier admonished that "in evaluating the reasonableness" of Officer Albrecht's conduct, "his actions must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." "With 20/20 vision of hindsight," we now know that Littlejohn was an unarmed blind man and posed no danger at all. The officers, however, did not know that as they approached the scene. Officer Thomas knew Littlejohn

by sight but acknowledged that, as he approached the scene, he did not know who that third figure in the back seat of the green Chevrolet was. Littlejohn, as that third figure, was shielded behind the front seat. His hands were completely out of the view of both officers. "From the perspective of a reasonable officer on the scene," Littlejohn was most definitely a suspect and posed a clear threat to the officers.

It is nowhere suggested by anyone in this case that Officer Albrecht's fellow officer, Marvin Thomas, was not a model of exemplary police procedure from start to finish. In that regard, it is significant to note the scene as described by Officer Joseph Mattingly as he arrived upon it several minutes after the shooting occurred. Officer Albrecht was already kneeling next to Rebecca Garnett and "administering compressions to her chest area." The suspects Darnell Budd and James Littlejohn had both been removed from the car. It was by that time obvious that neither of them was armed. Littlejohn, moreover, had now been identified by Officer Thomas, who knew him, as blind and as one who posed no threat whatsoever to the officers. Notwithstanding those facts, Officer Thomas had his shotgun out and trained on Budd and Littlejohn as Officer Mattingly arrived at the scene. Officer Mattingly testified:

> "We had two marked police cruisers stopped here in the parking lot, and I was behind those two.... I had seen those two when I pulled up. There was an officer over to the right area ... He had a shotgun out. It was aimed towards two individuals next to a car. I believe it was a blue car.... And I also observed Officer Albrecht kneeling next to a woman, that was lying on the ground, administering compressions to her chest area."

It is not suggested that Officer Thomas's precaution was in any way improper. But for the result, Officer Albrecht's earlier conduct had been indistinguishable.

What remains then as the possible predicate for Officer Albrecht's gross criminal negligence, for his reckless and wanton disregard of human life, is his ostensible reliance

"upon a weapon customized by him in highly questionable and potentially dangerous fashion." We hold that the evidence with respect to Officer Albrecht's use of the bandolier or sling is not a legally sufficient predicate for a finding of gross criminal negligence to support a verdict of involuntary manslaughter.

There was no evidence to the effect that Officer Albrecht's fitting of a bandolier on his shotgun was either "highly questionable" or "potentially dangerous." The bandolier carried fifteen rounds of ammunition. When fully loaded, the bandolier and the ammunition weighed a total of 2.39 pounds. Two experts testified with respect to the possible physical repercussions of the added weight on the firing of the weapon. Neither of the experts had any knowledge as to the policy of the Montgomery County Police Department with respect to such a bandolier.

Lester Lemrick was the Firearms Program Manager and Chief Gunsmith for the FBI. He testified that the added weight, in the hands of one not used to the added weight, could increase the possibility of an accidental discharge. James Hennings, a research designer with the Remington Arms Company, testified that the added weight would not make the gun more prone to accidental discharge:

"Q: Okay. I'd like to ask you about the bandolero. It's got 15 rounds and weighs, I think the testimony previously is, 2.39 pounds. Does that bandolero, with its extra weight and the fact that it swings around and sort of wobbles when it moves the gun, does it affect the trigger pull?

A: ... In my mind I don't believe that it does affect the trigger pull. It definitely affects the weight, you know, in the holding of the gun. Yes.

.     .     .     .     .

Q: Well, are you saying then that the weight of the bandolero and its shells does not make the 870 more prone to accidental discharge?

A: No, I wouldn't say it does. I would say it just makes it more cumbersome to handle."

More pertinently, two officers, who had been involved with weapons training at the Montgomery County Police Academy, testified with respect to the policy of the Montgomery County Police Department on the use of slings or bandoliers. Sergeant Muehlenhort testified that as a supervisor, he knew "that officers have slings on their shotguns. I have a sling on my shotgun that I carry out on the street." He testified that his use of a sling was to facilitate his carrying of the weapon, whereas other officers sometimes used the sling as a means for having more ammunition readily available. He explained that some officers will put additional ammunition into their pockets; that some will actually "mount some extra rounds on the side of the weapon, attach it to the side, to carry extra rounds, it's not uncommon;" and that some will use a sling for such a purpose:

"Q: The reason you have the sling with additional shells on it is for what purpose?

A: The only purpose I could imagine would simply be to carry extra rounds if you needed them.

Q: And by your carrying a shotgun equipped with a sling, you feel that some situation might arise where you might need extra rounds? Correct?

A: There's always that potential."

Officer Michael McNally testified as the firearms instructor at the Montgomery County Training Academy. He did not believe that the weight of fifteen shells on the bandolier would make it more likely to discharge:

"Q: ... Would the presence of the 15 shells on the strap in any way affect the function of the gun, either in terms of how it would be held, whether it might be more likely to discharge, the trigger pull, or anything like that?

A: No.... The only [effect] I can see that it has is on aiming the shotgun. When you're aiming, that sling is going like this, and if you were aiming the barrel does move somewhat."

Officer McNally testified that although the ammunition slings are not standardly issued by Montgomery County, the

officers are fully permitted to add slings to their weapons in their discretion:

"Q: ... Are the shotguns that are issued by Montgomery County equipped with slings?

A: No.

Q: Are officers permitted to put slings on them if they want?

A: Yes."

Officer McNally's attention was directed to the bandolier that had been attached to Officer Albrecht's shotgun and to the fifteen rounds that it contained. His testimony with respect to full compliance with the policies of the Montgomery County Police Department was clear:

"Q: Now, State's Exhibit No. 36 has a sling and extra rounds of shot shells in it? Is that correct?

A: That's correct.

Q: 15 to be exact?

A: Uh-huh.

Q: Now, just to make clear in my own mind, that sling is permitted to be used by officers of the Montgomery County Police Department? Is that correct?

A: Yes it is. That is correct.

Q: That number of shells is permitted to be inserted into the sling by members of the Montgomery County Police Department? Correct?

A: That's correct."

We hold that that use of the bandolier on the part of Officer Albrecht is not legally sufficient evidence to support a finding of gross criminal negligence. What he did was not in any way a violation of Montgomery County police procedures and cannot be said to demonstrate a reckless and wanton disregard of human life.

Turning to the evidence of reckless endangerment, the State's argument with respect to innocent civilians possibly being in the line of fire is an argument that contemplates an intentional firing. That is not what we have in this case. To

fire at a suspect with innocent persons in the line of fire would present one situation. Simply to aim at a suspect without intending to fire presents, by contrast, a quite different situation. There was no evidence presented that the mere pointing of a loaded shotgun, not by a civilian but by a police officer trained in the use of the weapon, presented any high or any acceptable risk that the gun might go off by accident. The only testimony with respect to that sort of risk came from Sergeant Griffin:

> "The Court: To what extent does pointing a shotgun at somebody run a risk that it will be discharged accidentally by an officer, either because of stress or any other factor other than the intention to pull the trigger?
>
> The Witness: To my knowledge, Your Honor, over the last 10 years, we have had our shotguns out and pointed hundreds of times in the County, and I'm only away—excuse me—I'm only aware of three accidental discharges on duty with a shotgun."

■ Quite aside from the extremely dubious nature of the State's evidence as to whether any innocent civilian was actually in the line of fire as opposed to being in the general neighborhood,[3] the risk factor testified to by Sergeant Griffin

---

**3.** Holding as we do that the evidence was not legally sufficient to support the convictions for reckless endangerment because of the insubstantiality of the "risk" factor based upon the mere aiming of the shotgun and not the firing of the shotgun, it is unnecessary to examine further the question of what victims might otherwise have been recklessly endangered. The record, however, is highly dubious in that regard.

Until the moment of the verdict, the third count charged the reckless endangerment of seven persons. In the course of rendering the verdict, the trial judge eliminated three of those persons—fellow Officer Marvin Thomas, Darnell Budd, and Iris Frazier—from the list of potential victims. He found Officer Albrecht guilty under that count for having recklessly endangered the lives of James Littlejohn, Carroll Walker, Travell Dumar, and Tequila Frazier. Darnell Budd was apparently removed from the list of victims of the ostensibly reckless endangerment because he was a prime suspect who bore some burden of culpability. As we have discussed, however, James Littlejohn was just as much of a suspect and posed just as much of a danger to the officers, from their perception at the moment, as did Darnell Budd. To hold a

was in the neighborhood of one per cent. That does not qualify for what Chief Judge Murphy described in *Minor v. State*, 326 Md. 436, 443, 605 A.2d 138 (1992), as "the *substantial risk* that the statute was designed to punish" or as "misconduct . . . *so reckless as to constitute a gross departure* from the standard of conduct that a [reasonable police officer] would observe." (emphasis supplied). Were it otherwise, every pointing of a shotgun by an officer would be a potential case of reckless endangerment. There would always be a one per cent chance that it might accidentally go off.[4] Indeed,

---

weapon on James Littlejohn until it was determined that he was neutralized as a threat was not "misconduct." *Minor v. State*, 326 Md. 436, 443, 605 A.2d 138 (1992).

Carroll Walker, an adult, was standing in the general area, but there is no indication he was in Officer Albrecht's line of fire as Officer Albrecht aimed at Rebecca Garnett or that he was within a wider arc that swept from Rebecca Garnett on the right across the green Chevrolet automobile to Darnell Budd on the left.

Travell Dumar, according to his own mother's testimony, was standing with his and her other children until after the shotgun had discharged. If it was Officer Albrecht's aiming of a loaded shotgun at Rebecca Garnett that constituted the act of reckless endangerment, the evidence was clear that Travell Dumar did not run into the allegedly dangerous area until a discernible period after the shotgun had already fired. Though the interval was slight, the danger was a *fait accompli* before Travell Dumar ran into the danger zone. He could not have been injured.

Tequila Frazier was a little girl on a tricycle who was, according to several witnesses, situated behind the green Chevrolet at the moment of the confrontation. There was no indication that either Officer Albrecht or Officer Thomas knew of her presence there or were in a position, if they looked, to know of her presence there. In the crime of reckless endangerment, the critical element of recklessness requires that the defendant be conscious of the risk that he then recklessly disregards. *Minor v. State*, 326 Md. 436, 442–443, 605 A.2d 138 (1992). Without such knowledge of risk, then followed by the reckless disregard of the risk, there can be no crime of reckless endangerment. Even under Maryland's objective, rather than subjective, conceptualization of reckless endangerment, a defendant must be conscious of the risk which he then recklessly disregards even though he need not be conscious of the further fact that he is thereby being reckless.

4. Our holding that the evidence was not legally sufficient in terms of establishing the "risk" factor itself relieves us of the burden of addressing a very nettlesome pleading problem. That is the problem of computing the units of prosecution with respect to the crime of reckless endangerment.

there was no evidence that Officer Albrecht's conduct was "misconduct." *Minor v. State,* 326 Md. at 443, 605 A.2d 138.

### Conclusion

In the last analysis, Officer Albrecht's firing of the shotgun cannot have been, in the same instant, both unintended and intended. The rendering of the verdict of not guilty of voluntary manslaughter established, for purposes of the entire case and not simply for that specific charge, that the firing of the gun was unintended. Guilt on the other counts, therefore, involving the critical questions of what was the precise act that represented the reckless and wanton disregard of human life and what was the precise act that represented the gross deviation from the standard of reasonable police conduct, cannot be predicated on the notion that that "precise act" was the intended firing of the weapon. That firing cannot incon-

---

With intentional crimes of violence, it is clear that the unit of prosecution is each separate victim. To explode a bomb on an airplane containing 300 passengers and crew constitutes 300 murders, not one. That principle, however, is not quite so clear when dealing with actual harm or threatened harm that is unintended.

If it is the life-endangering act itself that is the unit of prosecution and not each victim thereby endangered, then the second and third counts, each charging reckless endangerment, should not both have been in this case. One of them would have been redundant.

If, on the other hand, the unit of prosecution is each endangered victim rather than the mere act itself, then the third count in this case would present numerous problems. The naming or otherwise identifying of the victim would be a critical element. Permitting the State at the end of the State's case to amend the third count by adding for the first time the names of victims, where theretofore none had been named, would seem to represent an amendment going to actual substance and not to mere form.

There would be an additional problem of how seven crimes against seven victims could be charged in a single count. What would be the double jeopardy implications, for instance, if following, *arguendo,* the granting of a judgment of acquittal with respect to three victims, the overturning of the convictions of two more on the ground that the evidence was not legally sufficient, and the overturning of the convictions of the other two on some mere evidentiary ground, that count with respect to those two final victims was remanded for possible retrial? Fortunately, none of these problems is before us in this case and we intimate no answers with respect to them. The law of reckless endangerment is still relatively unplowed ground.

sistantly switch from "unintended" to "intended" as we move from count to count. Without that switch, the evidence fails.

Without that switch, we must "freeze" that instant in time just before the shotgun discharged and inquire as to whether the conduct of Officer Albrecht up until that moment, or the conduct of any Montgomery County officer similarly situated, would have been criminal. We agree with the general observations of the trial judge in this regard, save only his final conclusory sentence:

> "The range of my decision must not be misapprehended. I respect and admire our police and I support them as we all should. Felons should take no comfort in this decision. *There will be many occasions where displaying, chambering, pointing, and even firing of a shotgun by police will be the appropriate response. May 23rd, 1991,* on Larchmont Terrace in Gaithersburg, I am deeply said to say, *was not one of them."* (emphasis supplied).

That final sentence, we hold, was an *ipse dixit* that had no support in the evidence. If we pay more than lip service to the principle of law that Officer Albrecht should not be judged on the basis of the harm that resulted from his conduct but only on the basis of the antecedent conduct itself, he exhibited no reckless and wanton disregard of human life. He was involved, indisputably, in a felony stop of a vehicle involving multiple suspects. A stabbing had occurred and at least one of the stabbers, if not more, was believed to have left the scene in the car driven by Rebecca Garnett. There were indications that the group leaving in that car were drug pushers who might well be armed. However innocent Rebecca Garnett may have turned out to be in hindsight, she was definitely a suspect when Officer Albrecht first approached her. According to standard procedure, you do not aim a shotgun at a suspect only after you perceive that the suspect *is* armed. That may be too late. It is rather the case that you aim a shotgun at a suspect immediately and keep it aimed until you are satisfied that the suspect *is not* armed.

If aiming a shotgun at a suspect in the course of a felony stop of multiple suspects is a reckless or wanton disregard of human life or a gross deviation from standard police procedure, then that is what the Montgomery County Training Academy teaches. We do not believe that to be the case. If pointing a shotgun at a suspect under those circumstances is a reckless and wanton disregard of human life, then that is what Officer Albrecht's fellow officer, Officer Thomas, also was in the process of exhibiting on the day of this confrontation and that is what three of Officer Albrecht's fellow officers and classmates—Donna Howard, Joyce Barrow, and Harold Burch—exhibited on no less than thirty other occasions. We do not believe that to be the case.

Save only for the accidental discharge of the weapon, Officer Albrecht's conduct was no different from that, actual or hypothesized, of any of the other officers, with the single exception of Sergeant Muehlenhort. Neither did it deviate, let alone grossly deviate, from what he had been taught to do at the Police Training Academy. The norm, in terms of police response to a felony stop involving a vehicle and/or multiple suspects, is not what judges might wish it to be but what the evidence shows it to be. In terms of the evidence in this case, Officer Albrecht's conduct in aiming his weapon was the norm and not a departure, let alone a gross departure, therefrom.

We hold that, given the factual finding that Officer Albrecht did not fire the shotgun intentionally, the remaining evidence was not legally sufficient to support a finding of gross criminal negligence, to wit, evidence that he was acting without justification and in such a way as to exhibit a reckless and wanton disregard for human life. Neither was the remaining evidence, once any fact finding that the gun had been fired intentionally was rejected, legally sufficient to support a verdict that Officer Albrecht was guilty of misconduct so reckless as to constitute a gross departure from the standard of conduct that a reasonable police officer would observe. We hold, therefore, that the verdicts of guilty of involuntary manslaughter and of reckless endangerment, necessarily predicated on such states of mind, were clearly erroneous.

*JUDGMENTS REVERSED; COSTS TO BE PAID BY MONTGOMERY COUNTY.*