# CLAY *v.* STATE

[No. 54, October Term, 1956.]

*Decided January 11, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*David K. Ebersole, Jr.,* with whom were *Ginsberg & Ginsberg* on the brief, for appellant.

*Alexander Harvey, II, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, Anselm Sodaro, State's Attorney for Baltimore City,* and *James O'C. Gentry, Assistant State's Attorney* on the brief, for appellee.

PRESCOTT, J., delivered the opinion of the Court.

This is an appeal from the judgment and sentence after conviction of appellant by the Criminal Court of Baltimore, without a jury, of manslaughter by automobile, as defined by Sec. 455 of Art. 27 of the Code of Maryland (1951).

Appellant's principal contention is the lower court was clearly erroneous (Part 4, 1, Rule 7 (c) of Gen. Rules of Prac. and Proc.) in finding him guilty, because the statute specifically requires operation of the vehicle causing death to have been in a "grossly negligent manner".

Upon appeals under this Rule, it is not the duty of this Court to read the record and decide whether in its judgment the appellant in a criminal prosecution was guilty beyond a reasonable doubt. As stated in *Basoff v. State,* 208 Md. 643: "The function of this Court is merely to decide whether there was evidence, or proper inference from the evidence, upon which the trial court could find the defendant guilty. If the record shows such evidence or proper inference, the Court of Appeals cannot find that the decision of the trial court is clearly erroneous."

Bearing this in mind, it is necessary to set forth, somewhat in detail, the testimony to see if it, and the proper inferences therefrom, were such as to justify the trier of facts in determining guilt on the part of the appellant.

On Saturday night, October 29, 1955, appellant, an Army Lieutenant, stationed at Fort Holabird, Maryland, attended a farewell party given in his honor at the American Legion Hall located on Harford Road in the Hamilton section of Baltimore. He arrived at the party at approximately 9:30 P. M. and left at about 12:30 A. M. Some thirteen or fourteen persons were in attendance, and the guests danced and consumed alcoholic beverages. When the party broke up a number of those in attendance, including the appellant, decided to go to a section of Baltimore known as "Little Italy" to have something to eat. They occupied three automobiles. When he left the party, ap-

pellant was accompanied by Miss Madden in his automobile, a two-toned green 1950 Chevrolet. A Mr. Connizzari was in one of the other cars, and a Mr. and Mrs. Greenhalgh occupied the third. To reach its destination, the three car convoy took a route that passed through the intersection of Central and Ashland Avenues in downtown Baltimore, the latter being a "stop" street at that point. Mr. Greenhalgh, who had been driving south on Central Avenue, the favored street, stopped at this intersection because "there was traffic coming up and down" Ashland Avenue and "there were people crossing the street". When the Greenhalghs were just starting off again, appellant's vehicle suddenly passed them and struck a pedestrian walking across Ashland Avenue, causing his death.

At approximately 1:27 A. M., Officer Campbell, of the Accident Investigation Division of the Baltimore City Police Department, received a call to investigate the accident. Arriving several minutes later, the officer found the body of a man lying in the bed of Central Avenue. It was later identified as that of Chester C. Warren, a middle-aged negro man, who was pronounced dead on arrival at the hospital. With the assistance of a fellow officer, Officer Campbell made certain measurements and observations and as a result prepared a sketch showing what he had found. The sketch, which was introduced in evidence as State's Exhibit No. 2, showed that the body had been found 108 feet south of the south curb of Ashland Avenue, and 16 feet east of the west curb of Central Avenue. Four feet south of said south curb and 15 feet east of said west curb was a fresh scuff mark which Officer Campbell determined to be from one of the pedestrian's shoes. Starting 8 feet south of said south curb and 13 feet east of said west curb, Officer Campbell found fresh skid marks, which extended some 74 feet overall to the general vicinity where the body had been found. A pair of eyeglasses was found 56 feet south of said south curb, and 17 feet west of the east curb of Central Avenue. A "cloth drag" began 80 feet south of said south curb and continued 7 feet south. At approximately 88 feet south of said south curb, a "flesh drag" began and continued 11 feet south, leading up to the vicinity of the body.

When the officers arrived, they found a green Lincoln auto-

mobile sitting just north of the body of the pedestrian. They at first assumed this vehicle, which was owned by Mr. Greenhalgh, had been the one involved in the accident, but later ascertained that neither the striking vehicle nor its operator was on the scene. When recalled to the stand and questioned by the court, Officer Campbell testified that, from past experience he had determined that the scuff mark located in the cross-walk was caused by the foot or shoe of the decedent and that, therefore, he thought the point of impact was in the cross-walk.

Sergeant Trainor, who had likewise come to the scene of the accident shortly after it happened, testified that on the same day, October 30, 1955, he went to Fort Holabird and there arrested the appellant. He had on that occasion interrogated appellant and taken a statement from him which was offered in evidence as State's Exhibit No. 4. At that time, appellant admitted it was his vehicle that struck the pedestrian and pointed out his car.

Officer Campbell further testified there were street lights on the northwest and southeast corners of the intersection; there were no traffic control signals there; and the skid marks started very near to the scuff mark.

The statement of the appellant contained the following: "* * * After passing south of an intersection * * * a colored man was right in front of my auto and I hit him with the left front. He came back on the hood and then went off to the left side. I didn't see him before he appeared in front of me, but I think he came from my left". * * * "I was moving about 25 to 30 miles per hour. I stopped my auto, got out, and the colored man was lying north of my auto * * *. I looked at the man, got scared, got back in my auto and drove my girl * * * to her home. Then I drove to the post. * * * We all had been to a party and were on our way to Little Italy. I had some drinks, it was a party, but I was all right." The witness Greenhalgh was called, and stated he had been a guest at the party and was an occupant with his wife of one of the automobiles on the way to Little Italy. He testified as he was travelling south on Central Avenue and when he came to Ashland, "I slowed up and came to a stop * * *". "There was a car came by me and went across the street" * * *. "* * *

my wife hollered to get on the other side of the road, to stop, there was a man lying in the street." He further stated the first time he saw the deceased was when he was lying in front of his car about the middle of the block.

Mrs. Greenhalgh was then called. She attended the party and was riding with her husband as they approached the intersection above mentioned, at which Mr. Greenhalgh stopped. They had stopped for the intersection "and had started to go. Our car wasn't making no speed. The Lieutenant—this two toned car passed us and went down the street." She guessed it was the Lieutenant's car, and it hit a colored man. She "seen the man *walking* towards" this car. There were several exhibits and the state rested its case.

Miss Madden called by defense stated she had been to the party; the appellant had *about* three mixed drinks; she was riding with him at the time of the accident. She further testified: "We had crossed the street and the first thing I saw was this man. He was about three feet from the car. He was very close to the side. Before I knew what happened the man ran into the side of the front of the car. I turned my head. When I looked up again, he was on the hood of the car. * * *" She didn't believe the man was in the cross-walk when hit. On cross-examination, she admitted she had first told the police appellant had been "drinking heavy", (In this regard, we recognize and reaffirm the principle that a substantive fact cannot be established by impeachment of a witness, not a party to the suit, by previous contradictory statements.), and she was not sure whether or not deceased was in the cross-walk when struck.

Appellant then took the stand. He testified he had "some beer and a shot"; and, after crossing Ashland Avenue, about 35 to 45 feet down Central Avenue, he saw the colored man. "He was a very, very short distance from my automobile, my left front fender, when I did see him. I—my car struck the man and I—as he struck the car, he went up and hit the hood and rolled over to the left side of the car. * * * I was shaking, nervous. I left and I took Miss Madden home. From her home I went directly to Fort Holabird." In answer to a question as to what speed he was travelling when he approached Ashland Avenue, he replied: "You slow down at an intersection.

About 20 miles per hour. I took off again across Ashland Avenue". He further testified he got to within about 3 feet of the deceased before he saw him, and deceased was not running as far as appellant knew. Also, when he got back to camp, he did nothing to notify the authorities he had been involved in any accident.

Appellant also testified, and was corroborated by Greenhalgh, that immediately after the accident he was scared and nervous so he told Greenhalgh "to take care of things". However, in his statement given to the officers on the evening of the same day of the accident, he said, "I don't remember if I talked to Harold (Greenhalgh) or not, but when I left the scene he was still there".

Mr. Connizzara was called and said he was in the car in front of appellant, how far in front he did not know. He heard a thump like a car hitting a hole in the ground or a blowout.

Since the passage of Art. 27, Sec. 455, there have been three cases in this Court charging manslaughter by automobile: *Hughes v. State,* 198 Md. 424, 84 A. 2d 419; *Duren v. State,* 203 Md. 584, 102 A. 2d 277; and *Thomas v. State,* 206 Md. 49. They defined "gross negligence", and, have firmly established the test to be applied in determining it, namely, was the "conduct of the defendant, considering all the factors of the case, * * * such that it amounted to a 'wanton or reckless disregard for human life'." Applying this test, we see there is evidence from which the court below may have deduced any one or more of the following factors in finding guilt: failure to keep a proper lookout; passing recklessly at an intersection; striking a pedestrian in a cross-walk; excessive speed under the circumstances; driving while drinking to the extent of probably affecting one's judgment and discretion or probably affecting one's nervous system to the extent that there is a failure of normal coordination, although not amounting to intoxication; and flight.

With regard to the last two, we think that driving, after drinking in the manner just mentioned, is a proper matter, with others, for consideration in determining possible gross negligence. And, it has long been held that defendant's flight is relevant to be considered by the tribunal trying the facts as

bearing upon guilt. In *People v. Allen* (Ill.), 14 N. E. 2d 397, 407, a case involving manslaughter by automobile, it was said: "Flight from the scene of a collision without any effort to ascertain the extent of the injuries caused by his act or to aid the injured person may be taken into consideration as evidence of guilt." See also *People v. Schwartz* (Ill.), 131 N. E. 806; *State v. Studebaker* (Mo.), 66 S. W. 2d 877; 22 *C. J. S., Criminal Law,* par. 625; *Wharton, Criminal Evidence,* 12 Ed., Secs. 201, 205; *Blashfield, Cyclopedia of Automobile Law and Practice,* par. 5380. And this is so even though the flight may constitute a criminal offense. *22 C. J. S., Criminal Law,* pars. 625, 687.

These factors of drinking and flight, which suggest at least an unwillingness to face an issue of intoxication, are entitled to some weight, although not controlling. But the other factors, which involve flagrant violations of elementary principles of the traffic law, seem to us to amount to more than ordinary negligence. To strike a pedestrian in or near a cross-walk, in plain view under a street light, when in the act of speeding up to pass another car, and under the other circumstances described, meets the test, we think, laid down in the cases cited. Upon the record presented we think the finding of the trial judge was not clearly erroneous.

Appellant claims the lower Court committed error when it admitted into evidence a statement made by him on the grounds, (a) it was not shown to be voluntary, (b) it was not shown he knew its contents, (c) its contents were not relevant, (d) it was inadmissible hearsay, and (e) no foundation was laid for its admission. (a) and (e) seem to be the same. Assuming, without deciding, the statement were a confession, the burden of proof was upon the State to prove it was freely and voluntarily made and not procured by any improper inducements, *Hammond v. State,* 174 Md. 347. When it was offered, the following colloquy took place between the Court and counsel for appellant.

"(Mr. Ebersole) I am willing that that part of the statement be introduced which describes how the accident occurred, what his conduct was up to the time the accident occurred and the car was brought to a stop.

"(The Court) You want part introduced and part excluded?

* * *

"(The Court) We cannot have part in and part out.

"(Mr. Ebersole) I move to exclude the whole thing.

"(The Court) On what ground?

"(Mr. Ebersole) On the ground that it contains extraneous matter.

"(The Court) Do you concede the voluntariness of the statement or do you question that?

"(Mr. Ebersole) It is not signed. That is another thing.

"(The Court) That does not matter.

"(Mr. Ebersole) My particular point is that it contains matter not relevant to the matter before the Court today.

"(The Court) Your objection is overruled."

We think it is clear that the appellant conceded the voluntariness of the statement so far as the accident was concerned, and confined his objection to the fact of flight. Under the circumstances we think grounds (a) and (e) are not preserved on this appeal. *Banks v. State,* 203 Md. 488, 495.

With reference to (b) and (d), we are unable to discover from the record that these points were raised in, and decided by the Court below; so, under Rule 9 this Court is precluded from considering them.

This leaves (c). The statement was a narration by the appellant of the events leading up to, and the occurrence of, the fatal accident, and his conduct thereafter. Obviously this was competent, relevant and material evidence.

The appellant next contends there was error in allowing him to be asked whether after leaving the scene of the accident he did anything about notifying the police. This nearly has been answered by what we said above in regard to flight. We add, however, that flight after, and concealment of, a crime are admissible to show a consciousness of guilt. Had he called the police, it would have been a fact clearly admissible in his behalf to prove lack of concealment. We find no error here.

Appellant then alleges the Court erred in refusing to permit a witness, Officer Campbell, to explain why certain eyeglasses found at the scene of the accident were found a con-

siderable distance beyond the intersection, at or near where the accident happened, and east of the center of the street. He bases this contention on the unusual ground that the witness had attempted (without objection) to surmise by pure conjecture how the accident had occurred. Therefore, it was proper on cross-examination to permit the question, as it could only be answered logically by saying the glasses were near the point of impact, locating it more favorably to appellant. The place where the glasses were found was definitely described. They were not identified as belonging to the deceased. The undisputed testimony showed deceased was struck while the car was in motion and his body rolled up, over and off the hood. There were skid marks beginning in or near the cross-walk and leading nearly up to the body. In a situation of this kind, there were no facts developed upon which the witness could base a sound opinion; therefore, if permitted, it would result in pure conjecture. We hold the lower Court's ruling thereon was correct.

Appellant's last complaint is, the Supreme Bench of Baltimore erred in passing the order dated April 26, 1956, in which his Motion in Arrest of "Verdict" was dismissed. The order itself states the reason for the dismissal, a failure to comply with the Court's Rules. We were not referred to, nor have we found, the Rules in the record. We must, therefore, presume the Court acted correctly and in accordance with them. *Tyler v. Murray,* 57 Md. 418, 435; *Cherry v. Baker,* 17 Md. 75, 77. In any event, we think the motion amounted to no more than one for a new trial, which is not a proper subject for appeal. *Ozinec v. State,* 169 Md. 705, unreported.

> *Judgment and sentence affirmed, and appeal from the order of the Supreme Bench dismissed, with costs.*