774 A.2d 394

**Glenn Lydell MEANOR,**

**v.**

**STATE of Maryland.**

**No. 106, Sept. Term, 2000.**

Court of Appeals of Maryland.

June 22, 2001.

Mark Colvin, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Celia Anderson Davis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, JJ.

WILNER, Judge.

Petitioner, Glenn Meanor, was convicted in the Circuit Court for Howard County of driving while intoxicated, driving under the influence of alcohol, and failure to obey a traffic control device, for which he was given a suspended jail sentence. Those judgments were affirmed by the Court of Special Appeals. *Meanor v. State*, 134 Md.App. 72, 758 A.2d 1124 (2000).

We granted *certiorari* to consider whether (1) petitioner was effectively charged with driving while intoxicated per se, (2) the trial court erred in instructing the jury that petitioner was intoxicated if his blood alcohol content (BAC) was 0.10 or more, and (3) the results of a breath test that he opted to take were admissible in light of the arresting officer's failure to inform him that, if he refused to take the test, the Motor Vehicle Administration (MVA) could modify an otherwise automatic suspension of his driver's license and issue him a restrictive license if he participated in the Ignition Interlock System Program. Our responses to these questions, which we shall address in a slightly different order, will lead to a vacation of the Court of Special Appeals judgment.

## BACKGROUND

The relevant facts are essentially undisputed. Meanor and a friend, Dixon, spent the evening of February 11, 1999, drinking at a nightclub. When they left the club, they agreed that Meanor had too much to drink and that Dixon should drive Meanor's car. They had not proceeded far when Dixon was stopped by Officer Mui, who had observed the car weaving between lanes. After failing several field sobriety tests, Dixon was arrested. Mui and Sergeant Christis, a backup

officer who arrived at the scene, noted a strong odor of alcohol on Meanor's breath and the fact that he had glassy eyes and slurred speech. Believing that he, too, was intoxicated, the officers directed him not to drive. They offered to take him to the police station or to a public telephone and advised that they could arrange to have the car towed or he could wait on the shoulder for a ride home. Meanor declined their offer of assistance and said that he would use his cell phone to make the necessary arrangements. Officer Mui transported Dixon to the police station, and Sergeant Christis drove a short distance away and parked in the center median strip so that she could keep Meanor's vehicle in view.

Some 20 minutes later, Christis observed Meanor pull onto the road and resume his journey. She began following the car, and, when it crossed the white line separating the road from the shoulder, she initiated a traffic stop. When Meanor performed poorly on three field sobriety tests, Christis placed him under arrest and seated him in the back of her police car. She then read him the Advice of Rights from the DR–15 form prepared by MVA regarding his right to take or refuse to take the breathalyzer test mandated by State law. Meanor made no election at that time, and they proceeded to the police station, where he was directed to read for himself the Advice of Rights form. After doing so, he initially refused to take the test but later, upon learning that Dixon had been processed and released, he consented. The test was performed, and the results showed a BAC of 0.13.

Meanor was issued two citations. One, we presume, was for the traffic control violation. On the other, relevant here, Sergeant Christis circled Item 33, charging Meanor with violating "21–902 Driving While Intoxicated & Under Influence Alcohol & Under Influence of Drugs, & Drugs & Alcohol & Controlled Dangerous Substance." Upon Meanor's request for a jury trial, the case was transferred from the District Court to the Circuit Court for Howard County. At trial, Meanor said that, after the officers left, he made several calls on his cell phone to arrange a ride but succeeded in reaching only answering machines. While waiting for someone to

return his call, the battery in his cell phone went dead, and, fearing for his safety while parked on the side of the road, he decided to proceed to the next exit and find a pay phone.

At the commencement of trial, the State informed the court and Meanor that he was being charged generally under § 21–902 of the Transportation Article, and it asked that the case proceed under § 21–902(a) and (b). Meanor then moved, *in limine*, to exclude the results of the breath test on the ground that he was not properly advised of the consequences of refusing to take the test. Specifically, he pointed out that the advice of rights he was given stated that a refusal to take the test would result in a suspension of his driver's license for 120 days, if this were a first offense, and that he would be ineligible for a modification of the suspension or the issuance of a restricted license. It did not, he complained, inform him that MVA could modify the suspension if he agreed to participate in the Ignition Interlock System Program authorized under § 16–404.1 of the Transportation Article. The court denied the motion and, at the appropriate time, the results of the breath test were admitted.

In its instructions to the jury, the court explained the offenses of driving while intoxicated and driving under the influence of alcohol. With respect to the former, it told the jury that a person is intoxicated when the alcohol that he has consumed has substantially impaired normal coordination and, over Meanor's objection, added this language:

"Now you've heard evidence in this case that the Defendant's breath was tested for the purposes of determining the alcoholic content of the Defendant's blood. The [e]ffect of such results is as follows. If you find that at the time of testing, the Defendant had point one zero percent or more by weight of alcohol in the blood, the Defendant was intoxicated."

The prosecutor stressed that point during closing argument and reminded the jury several times that the test results showed a BAC of 0.13. During its deliberations, the jury sent a note asking, "if we agree that the blood alcohol level was

point one three, are we required to find the Defendant guilty of driving while intoxicated," to which the court replied that all elements of the crime must be proved beyond a reasonable doubt and that the jury may review the court's instructions. As noted, the jury convicted of both driving while intoxicated and driving under the influence of alcohol.

## DISCUSSION

The issues raised by Meanor, centering on the challenged jury instruction and the reception into evidence of the BAC test results, can be understood only in the context of statutory changes made over the past decade to the laws relating to drunk driving. We shall need, therefore, to examine those changes in some detail. Indeed, the changes are ongoing. Some of the substance and much of the terminology applicable in this case have been changed by legislation enacted in the 2001 Session of the General Assembly. *See* 2001 Md. Laws, ch. 5. We shall note those recent changes where pertinent.

### *The Jury Instruction*

(A) *Whether Driving While Intoxicated Per Se Is A Separate Offense*

■ At the time relevant to this case, Maryland Code, § 21–902(a) and (b) of the Transportation Article, provided as follows:

"(a) *Driving while intoxicated or intoxicated per se.*

(1) A person may not drive or attempt to drive any vehicle while intoxicated.

(2) A person may not drive or attempt to drive any vehicle while the person is intoxicated per se.

(b) *Driving while under the influence of alcohol.*

A person may not drive or attempt to drive any vehicle while under the influence of alcohol."

Section 11–127.1 of the Transportation Article defined the term "intoxicated per se" as "having an alcohol concentration at the time of testing of 0.10 or more as measured by grams of

alcohol per 100 milliliters of blood or grams of alcohol per 210 liters of breath." [1]

Meanor regards § 21–902(a)(1) and (2) as creating two separate offenses. Though acknowledging that, by virtue of the definition in § 11–127.1, evidence of a BAC of 0.10 or more would suffice, on its own, to justify a conviction of driving while intoxicated per se under § 21–902(a)(2), he urges that such a BAC would not be conclusive with respect to § 21–902(a)(1)—that it is possible for a person to have a BAC of 0.10 or more and not have his normal coordination substantially impaired by alcohol. Because, in his view, he was never properly charged with a violation of § 21–902(a)(2), the court's instruction informing the jury that a BAC of 0.10 or more would render him intoxicated created an impermissible per se test for the § 21–902(a)(1) offense and was therefore erroneous as a matter of law.

The State's view is that § 21–902(a)(1) and (2) are *not* separate offenses. It contends that there was but one offense of driving (or attempting to drive) while intoxicated, which may be proved either by showing a BAC of 0.10 or more or by other evidence indicating coordination substantially impaired by alcohol. The Court of Special Appeals adopted the State's view, holding that § 21–902(a)(2) simply "provide[s] a method of convicting an accused of driving while intoxicated by a reduced 'grade of proof.' " *Meanor v. State, supra,* 134 Md.App. at 81, 758 A.2d at 1129. The legislative history of

---

1. The major substantive change effected by the 2001 legislation was to reduce the BAC level for what previously was termed "intoxicated per se" from 0.10% to 0.08%. The bill also substituted the term "under the influence of alcohol" for "intoxicated," as used in § 21–902(a), and "impaired by" for "under the influence of," as used in § 21–902(b). Thus, § 21–902(a)(1) will now prohibit a person from driving or attempting to drive a vehicle "while under the influence of alcohol," § 21–902(a)(2) will prohibit driving or attempting to drive a vehicle "while the person is under the influence of alcohol per se," and § 21–902(b) will prohibit driving or attempting to drive a vehicle "while impaired by alcohol." Section 11–127.1 was amended to define "under the influence of alcohol" as having an alcohol concentration at the time of testing of 0.08 or more.

§ 21–902(a)(2) establishes rather conclusively the fallacy in the State's position.

Prior to 1995, § 21–902(a) prohibited a person from driving or attempting to drive a vehicle while intoxicated, and § 21–902(b) prohibited a person from driving or attempting to drive while under the influence of alcohol. Neither term—intoxicated or under the influence—was legislatively defined, and neither had been judicially defined by us for purposes of § 21–902. In *Clay v. State,* 211 Md. 577, 584, 128 A.2d 634, 638 (1957), we defined "under the influence of alcohol," for purposes of the manslaughter by automobile statute, as "drinking to the extent of probably affecting one's judgment and discretion or probably affecting one's nervous system to the extent that there is a failure of normal coordination, *although not amounting to intoxication."* (Emphasis added). In *Alston v. Forsythe,* 226 Md. 121, 132, 172 A.2d 474, 479 (1961), we applied that definition in a civil action for negligence arising out of an automobile accident.

The pattern jury instruction drafted by the Maryland State Bar Association Standing Committee on Pattern Jury Instructions (MPJI–Cr 4:10), which is often used by the trial courts and was used in this case, not only makes clear that the distinction between the two states is one of degree but provides what seems to us a better definition of "under the influence" and a workable and reasonable distinction between that and intoxication. It states:

> "The distinction between driving while intoxicated and driving under the influence of alcohol is one of degree. A person is under the influence of alcohol when the alcohol that [he][she] has consumed has impaired normal coordination, although not amounting to intoxication. Another way of saying this is that the person's abilities have been reduced or weakened by the consumption of alcohol.

> Intoxication means more than being under the influence of alcohol. A person is intoxicated when the alcohol that

[he][she] has consumed has substantially impaired normal coordination."

Under the pre–1995 law, evidence regarding the existence of either state came predominantly from the observations of arresting officers or other witnesses regarding the defendant's appearance and conduct, how well he or she performed on field sobriety tests, and presumptions established by § 10–307 of the Courts and Judicial Proceedings Article. That section, which was part of the law dealing with chemical tests for BAC, provided that (1) if the test showed a BAC of 0.05 or less, it was to be presumed in a prosecution under § 21–902 that the person was not driving under the influence of alcohol; (2) if the test showed a BAC of more than 0.05 but less than 0.07, that fact gave rise to no presumption, one way or the other, of driving under the influence or while intoxicated but could be considered along with other evidence; (3) a BAC test result of 0.07 or more constituted prima facie evidence that the defendant was driving under the influence of alcohol; and (4) a BAC test result of 0.10 or more was prima facie evidence that the defendant was intoxicated.

It was also the case under that regime, pursuant to § 16–205.1 of the Transportation Article, that MVA was required to suspend a person's driver's license for certain periods of time—60 days to 6 months for a first offense, 120 days to one year for a subsequent offense—if the defendant refused to take the test, unless the defendant was required to drive a vehicle in his/her employment, needed a license to attend an alcoholic treatment or prevention program, or because of an unavailability of alternative means of transportation, the lack of a license would severely impair the defendant's ability to earn a living. In those circumstances, MVA could modify the otherwise mandated suspension. Although MVA could revoke a driver's license upon the licensee's conviction for driving while intoxicated or under the influence of alcohol, there was no provision for an administrative sanction based solely on a BAC test result.

In 1988, concerned over the carnage caused by drunk and

drugged drivers,[2] the General Assembly, by House Joint Resolution 53 (1988), created a Task Force on Drunk and Drugged Driving, for the purpose, among others, of examining methods of increasing the remedies then available for combating drunk and drugged driving and recommending changes in the laws and regulations dealing with that problem. At its first meeting, the Task Force placed at the top of the list of issues to be considered two forms of per se remedies—an *administrative* per se law that would provide for the suspension of the license of a driver whose BAC exceeded a certain standard, and a *criminal* per se law that would establish a certain BAC level and make a breath test result in excess of that level "dispositive of guilt." *See* TASK FORCE ON DRUNK AND DRUGGED DRIVING MINUTES, September 13, 1988, at 1.

Those issues tended to predominate much of the work of the Task Force during the Fall of 1988, in part, perhaps, because of incentives/sanctions from the Federal Government. 23 U.S.C. § 408 authorized Federal grants to the States for alcohol safety programs provided the State met certain conditions set forth in the statute, one of which was that any person with a BAC of 0.10 or greater when driving a motor vehicle "shall be deemed to be driving while intoxicated." § 408(e)(1)(C). Evidence was presented that 44 States and the District of Columbia had enacted a criminal per se law with 0.10 or less as the standard and 23 States had enacted an administrative per se law. Although most of the discussion centered on the administrative per se recommendation and how such a law would be implemented, a question was raised about how a criminal per se law would operate in relation to the existing offenses. Judge Garmer, a member of the Task Force who was then a District Court judge, asked whether, "under an illegal per se law, a person would be charged under both the per se and DWI offense," and the reply, from the State's Attorney member of the Task Force, was that "this

---

**2.** Evidence showed that alcohol had been identified as a contributing factor in the highway deaths of nearly 2,700 people in Maryland in the preceding seven years. *See* 1988 INTERIM REPORT OF THE TASK FORCE ON DRUNK AND DRUGGED DRIVING at 1.

would be the case." *See* TASK FORCE ON DRUNK AND DRUGGED DRIVING MINUTES, October 25, 1988 at 4.

This view—that a criminal per se law would be a new, separate offense that could be charged in addition to the existing driving while intoxicated or driving under the influence offenses—was made crystal clear in the Task Force's 1988 Interim Report to the General Assembly. Although the Task Force urged the immediate enactment of an administrative per se law and recommended deferring consideration of a criminal per se law until after the antiquated breathalyzer machines then being used were replaced by more modern and reliable equipment,[3] it described the criminal per se proposal thusly:

> "An illegal per se statute would establish *a new criminal offense* of operating a motor vehicle with an alcohol concentration in the driver's blood that meets or exceeds a certain statutorily defined limit. *It is not necessary under an illegal per se law to prove that a driver was intoxicated* or under the influence of alcohol. All that is necessary is to prove that the individual was operating a motor vehicle with more than a certain amount of alcohol in the individual's blood.

> \* \* \*

> An illegal per se law would not replace the current prohibitions, but would supplement them. For example, if an individual's BAC test revealed a BAC level at or above 0.10, *the individual could be charged with 2 separate violations;* i.e., driving while intoxicated/under the influence, *and the separate per se offense.* If intoxication or being under the influence cannot be proved, for example, due to insufficient physical and behavioral evidence, the objective result of the BAC test alone, unless successfully challenged (e.g., lack of

---

**3.** The Task Force noted that the State was already in the process of replacing the existing machines and that it would take between 18 months and three years to complete the replacement and training.

probable cause, testing error, etc.) would be sufficient to convict the individual of the per se offense."

1988 INTERIM REPORT OF THE TASK FORCE ON DRUNK AND DRUGGED DRIVING at 15, 16–17 (emphasis added).

In furtherance of the Task Force's recommendation, the General Assembly enacted an administrative per se law at its next session. *See* 1989 Md. Laws, ch. 284. Bills to create a criminal per se law failed in the 1993 and 1994 sessions but one finally was enacted in 1995. *See* 1995 Md. Laws, ch. 498, enacting Senate Bill 256. Both the manner in which the law was drafted and the reports issued by the Senate and House Committees that considered the bill confirm beyond cavil that the new per se offense was intended to be a separate criminal offense and not merely an easier way of proving the existing offenses.

If all that was intended was an easier way of proving intoxication or driving under the influence, as the State posits, the Legislature could simply have added that provision to § 10–307 of the Courts and Judicial Proceedings Article, which already set forth the evidentiary effects of BAC test results. Indeed, it *did* amend § 10–307 in the same bill, but only to conform it to the new offense. It repealed that part of § 10–307 that made a test result of 0.10 or more "prima facie evidence" that the defendant was driving while intoxicated. Instead of addressing the issue in § 10–307, the Legislature split § 21–902(a), which created the offense of driving while intoxicated, to establish a separate prohibition against driving with a BAC of 0.10 or more.[4] The Committee and Floor Reports well document the legislative intent. Both the Senate

---

4. The new offense enacted in the 1995 legislation stated that "[a] person may not drive or attempt to drive any vehicle while the person has an alcohol concentration of 0.10 or more as measured by grams of alcohol per 100 milliliters of blood or grams of alcohol per 210 liters of breath as determined at the time of testing." The next year, by 1996 Md. Laws, ch. 652, the Legislature amended § 21–902(a)(2) to read that a person may not drive or attempt to drive any vehicle while the person is intoxicated per se and placed the language defining that state into new § 11–127.1. Those changes were ones of style.

Judicial Proceedings Committee and the House Judiciary Committee Bill Analysis state, at the outset, that "[t]he bill *makes it a misdemeanor* for a person to drive or attempt to drive any vehicle while the person has an alcohol concentration of 0.10 or more," and that it "imposes the same penalties *for this offense* as are currently imposed on a person who is convicted of driving while intoxicated." *See* SENATE JUDICIAL PROCEEDINGS COMMITTEE BILL ANALYSIS and HOUSE JUDICIARY COMMITTEE BILL ANALYSIS on Senate Bill 256 (1995) at 1.[5]

Further evidence that the General Assembly intended driving while intoxicated per se to be a separate offense is found in the fact that, in other sections of the Transportation Article that refer to, or use as a base, violations of § 21–902, it has stated the intoxication and intoxication per se offenses separately. *See*, for example, § 16–205(a)(1), permitting MVA to revoke the driver's license of any person who "[i]s convicted under § 21–902(a) or (d) of this article of driving or attempting to drive a motor vehicle while intoxicated, while intoxicated per se, or while under the influence of a controlled dangerous substance." *See also* § 26–405, providing that, if a person is charged "with a violation of ... § 21–902 of this article ('Driving while intoxicated, while intoxicated per se, under the influence of alcohol ... ), the court may find him guilty of any lesser included offense under any subsection of the respective section." Finally, it is clear from the elements of the offenses themselves that they are not the same. Driving while intoxi-

---

**5.** Of some interest as well is the position paper presented to the Committees by Mothers Against Drunk Driving Maryland Organization (MADD), an organization that was specifically represented on the Task Force pursuant to House Joint Resolution 53 (1988) and which was one of the leading and most active proponents of the criminal per se legislation. In that paper, MADD addressed whether, if an "illegal per se" law were enacted, the existing laws based on behavioral evidence should be discarded. Its response was "No, the older driving while intoxicated (DWI) or driving under the influence (DUI) laws should be retained for those cases in which no chemical test is available. This can occur either when an offender refuses to take a chemical test or when some problem develops with the test result. Often, an offender is charged under both the 'per se' and 'presumptive' laws and one of the charges is dropped at a later date."

cated does not require proof of any particular BAC, but it does require proof of a substantial impairment of normal coordination; driving while intoxicated per se, on the other hand, requires proof of a BAC of at least 0.10 (now 0.08) but does not require proof of any impairment of normal coordination.

Ignoring all of this clear and abundant evidence of legislative intent, which is dispositive of the issue, the State looks to decisions in some other States to support its view that § 21-902(a)(2) creates no more than a reduced evidentiary burden for proving intoxication. Not only do the cases it cites not support its position, but the predominant view around the country is exactly to the contrary. *State v. Gonzales,* 26 S.W.3d 919 (Tex.App.2000) is cited for the proposition that the State may prove intoxication "by reason of loss of faculties or by reason of alcohol concentration (intoxication per se)," and *State v. Edmondson,* 125 Idaho 132, 867 P.2d 1006 (App.1994) is cited for a similar proposition. What the State omits to mention, however, is that the Texas and Idaho statutes, unlike that of Maryland, appeared to define intoxication in that alternative manner. As the *Gonzales* court pointed out, the statute defined "intoxicated" as "not having the normal use of mental or physical faculties by reason of the introduction of alcohol or other proscribed substance into the body, *or* as having an alcohol concentration of 0.10 or more." *Gonzales,* 26 S.W.3d at 920 (emphasis added). When the trial court dismissed a prosecution because the BAC was less than 0.10, the appellate court reversed, holding that the State could also prove intoxication by showing the impairment of mental or physical faculties. In *Edmondson,* the State expressly limited the prosecution to a showing that the defendant drove with a BAC in excess of 0.10, which, under the Idaho statute, was one of two alternative methods of proving the offense of driving under the influence of alcohol. In that circumstance, the court held that evidence offered by the defendant of the lack of observable signs of intoxication was irrelevant and properly excluded.

Of greater relevance are *Anderjeski v. City Court,* 135 Ariz. 549, 663 P.2d 233 (1983); *State v. Carter,* 810 S.W.2d 197 (Tex.Crim.App.1991); *Hadden v. State,* 180 Ga.App. 496, 349 S.E.2d 770 (1986); *State v. Coulombe,* 143 Vt. 631, 470 A.2d 1179 (1983); and *People v. Stiffler,* 237 A.D.2d 753, 655 N.Y.S.2d 139 (1997), all holding or implying that the traditional intoxication and the intoxication per se offenses are separate crimes, and that the latter is not simply a device for facilitating proof of the former.

(B) *Whether Driving While Intoxicated Per Se Was Properly Charged*

■ Maryland law directs that a violation of the motor vehicle laws, including § 21–902, be charged by citation, rather than by some other form of charging document. *See* § 26–201(a) and (b) of the Transportation Article and Maryland Rule 4–201(b). The law also directs the Chief Judge of the District Court, after consultation with police administrators and MVA, to design arrest citation forms "that shall be used by all law enforcement agencies in the State" when charging a person with traffic offenses. *See* § 1–605(d)(8) of the Courts and Judicial Proceedings Article. Meanor was charged via the Maryland Uniform Complaint and Citation form adopted and distributed in accordance with § 1–605(d)(8).

Although Maryland Rule 4–203(a) and Maryland common law permit two or more offenses to be charged in separate counts of a charging document if they are of the same or similar character or are based on the same act or transaction or connected acts or transactions, the Uniform Complaint and Citation form expressly requires that only one violation be charged on a citation. The citation form contains 42 enumerated violations, any one of which may be charged by circling the particular charge, and it also contains a blank space for the officer to charge a "violation not listed above." The citation form directs the officer to "Circle Violation Below (One Violation Only)." Three of the 42 listed offenses involve § 21–902. One—No. 33, the one circled here—states "21–902 Driving While Intoxicated & Under Influence Alcohol & Un-

der Influence of Drugs, & Drugs & Alcohol & Controlled Dangerous Substance." The other two, Nos. 34 and 35, charge "21–902(a) Driving While Intoxicated" and "21–902(b) Driving Under Influence of Alcohol" respectively. There is no listed charge for driving while intoxicated per se; nor does No. 33, which refers to the other offenses stated in § 21–902, mention that offense. If driving while intoxicated per se is to be expressly charged, therefore, it must be charged in the space available for a "violation not listed above." That was not done.

■ In *Beckwith v. State*, 320 Md. 410, 578 A.2d 220 (1990), we held that, under Maryland common law, "a defendant can ordinarily be convicted of an offense which is not charged but which is a lesser included offense of one that is charged." *Id.* at 413, 578 A.2d at 222 (quoting *Hagans v. State*, 316 Md. 429, 433, 559 A.2d 792, 793–94 (1989)). We noted that, under § 26–405 of the Transportation Article, that rule applied as well to offenses under § 21–902. There are two caveats to that general proposition, however, one of which we dealt with in *Beckwith* and the other of which is applicable here. In *Beckwith*, the defendant was not charged generally under § 21–902, but rather with driving while intoxicated under § 21–902(a). In that circumstance, we held that the State had limited the charge to that offense alone and had effectively excluded the lesser included charge of driving under the influence.

Unlike Beckwith, Meanor was charged generally under § 21–902, so he could have been convicted of any lesser offense included within that charge, and, indeed, he *was* convicted of driving under the influence. The problem for the State, however, as we have held above, is that driving while intoxicated per se is *not* a lesser included offense of driving while intoxicated. It is a separate offense, as both driving while intoxicated and driving while intoxicated per se each have an element not found in the other. Accordingly, we hold that Meanor was not charged with driving while intoxicated per se.

■■ That holding necessarily renders the challenged jury instruction erroneous. As noted, it informed the jury that, if it found that Meanor had a BAC exceeding 0.10 at the time of testing, he was intoxicated. Although the jury certainly *could have* found that Meanor was driving while intoxicated based on that BAC test result, the test result itself does not establish intoxication. For that reason, the conviction for driving while intoxicated must be vacated.[6]

## Advice of Rights

■ As an alternative ground of reversal, Meanor complains that the BAC test result was inadmissible because he was not properly advised of the consequences of refusing to take the test, namely, that MVA could modify the otherwise mandated suspension of his driver's license and issue him a restricted license if he participated in the Interlock Ignition System Program for at least one year. That omission, he urges, amounted to a noncompliance with § 16–205.1(b)(2)(iii) of the Transportation Article, that the test was therefore not in compliance with § 16–205.1 and, by virtue of § 10–309(a)(1) of the Courts and Judicial Proceedings Article, evidence of its results was inadmissible.[7]

---

**6.** The erroneous jury instruction does not affect the conviction for driving under the influence, however. Under our holding in *Beckwith*, that offense *was* effectively charged and there was more than ample evidence to support the conviction.

**7.** From 1982 to 2000, § 10–309(a)(1) was ambiguous in this regard. When initially enacted as part of the Courts and Judicial Proceedings Article in 1973, it stated that a person may not be compelled to submit to a chemical analysis provided for *in this subtitle* and that evidence of chemical analysis was not admissible if obtained contrary to *its* provisions, the word "its" obviously referring to the subtitle—title 10, subtitle 3 of the Courts and Judicial Proceedings Article. In *State v. Loscomb*, 291 Md. 424, 435 A.2d 764 (1981), we held that that exclusionary rule applied to prosecutions for manslaughter by automobile under Article 27, § 388 and homicide by motor vehicle under § 388A and that it was triggered by violations of Transportation Article, § 16–205.1, notwithstanding that § 16–205.1 was not then part of the subtitle in the Courts and Judicial Proceedings Article. *See also State v. Werkheiser*, 299 Md. 529, 474 A.2d 898 (1984). In 1982—the next session following the filing of *Loscomb*—the Legislature amended § 10–

Since the enactment of its simple predecessor in 1969, as § 92A of former Article 66½ of the Code, § 16–205.1 has undergone multiple revisions and has grown from three to twelve pages, bringing with it all of the complexities that such a growth ordinarily entails. Prior to the 1969 enactment, the law made the results of a chemical test admissible in a prosecution for driving while under the influence of alcohol, but the test itself was not mandatory, a person could not be compelled to take it, and the fact that the person refused the test was not admissible in evidence. The only advice that a police officer was required to give was that the person may, but need not, submit to the test. *See* Maryland Code (1957, 1965 Repl.Vol.) Article 35, § 100.

The 1969 law, keying on our favorable declaration in *Mauldin v. State*, 239 Md. 592, 595, 212 A.2d 502, 504 (1965), made it a condition to the issuance or renewal of a driver's license that the licensee consent in writing to take a chemical test to determine BAC should the person be detained on suspicion of operating a vehicle while under the influence of or impaired by alcohol. The law did not actually compel the person to take

---

309(a) to provide that evidence of a test or analysis is not admissible "in a prosecution for a violation of § 21–902 of the Transportation Article if obtained contrary to *its* provisions." *See* 1982 Md. Laws, ch. 93 (emphasis added). That remained the language until 2000, when, as part of 2000 Md. Laws, ch. 629, the Legislature deleted the word "its" and restored the reference to "this subtitle." The obvious intent of the 1982 law was to overturn *Loscomb*, to limit the exclusionary rule to prosecutions under § 21–902, and thus to render it inapplicable to prosecutions under §§ 388 and 388A. If one applies normal rules of English grammar, however, the word "its" in that formulation of the statute would seem to apply only to § 21–902. Apart from the fact that § 21–902 contains no provisions relating to the test, which would make that reference utterly meaningless, there is no evidence that the Legislature intended to detach the exclusionary provision from a violation of § 16–205.1. For whatever reason, the Legislature overlooked an opportunity to correct the inappropriate reference in 1989. *See* amendments made to § 10–309 by 1989 Md. Laws, ch. 284. Notwithstanding the grammatical "glitch," we construe § 10–309(a) as still triggered by a violation of the "subtitle," including § 16–205.1. We have long applied the principle that the Legislature's manifest intention will prevail over rules of grammatical construction. *See Welsh v. Kuntz*, 196 Md. 86, 75 A.2d 343 (1950).

the test, but it permitted MVA to suspend the license for up to 60 days if the person, upon request, refused to do so. Notwithstanding that suspension was the only mechanism for enforcing the consent, it was merely permissive and not mandatory. In that regard, the statute required a police officer who stopped a person suspected of operating a motor vehicle under the influence of or while impaired by alcohol to request that the person take the test and "[a]dvise the person of the administrative penalties that may be imposed for such refusal." Maryland Code (1957, 1969 Supp.) Article 66½, § 92A(c)3.

Under the 1969 law, as amended from time to time, the suspension sanction was available only if the driver refused to take the test upon a proper request. As noted, that changed with the enactment in 1989 of the administrative per se legislation. The 1989 law had a dual thrust. It *required* MVA to suspend the license of a person who was properly stopped, asked to take the test, and refused. The suspension was mandatory and it was to last for 120 days for a first offense and one year for a subsequent offense. The law also mandated a suspension, for lesser periods, if the person took the test and it revealed a BAC of 0.10 or more. In the latter situation, however, the law permitted MVA to modify the suspension or issue a restrictive license if (1) during the preceding five years, the person's license had not been suspended and the person had not been convicted under § 21–902, and (2) the person was required to drive a motor vehicle in the course of employment, a license was required to attend an alcoholic prevention or treatment program, or the licensee had no alternative form of transportation available and, without the license, his or her ability to earn a living would be severely impaired. No such modification was allowed, however, in the event of a test refusal. The 1989 law required the arresting officer to advise the driver "of the administrative sanctions that shall be imposed for refusal to take the test and for test results indicating an alcohol concentration of 0.10 or more at the time of testing." Maryland Code (1989 Supp.) Transp. art., § 16–205.1(b)(2)(iii).

In 1992, we decided two cases bearing on the advice required to be given. In *Motor Vehicle Admin. v. Chamberlain,* 326 Md. 306, 604 A.2d 919 (1992), the defendant, who refused to take the test and, as a result, had his license suspended for 120 days, complained that the officer failed to inform him that, if he took the test and it showed a BAC of 0.10 or more, MVA could modify the mandated 45-day suspension or issue him a restricted license under the conditions set forth in § 16-205.1. He presented the issue of "how much advice the Legislature intended the police to give a detained driver concerning the consequences of refusing or failing a chemical test for alcohol." *Id.* at 312, 604 A.2d at 922. We held that the statute required advice only as to "administrative sanctions that shall be imposed," and that "[m]ere potential eligibility for modification of suspension or a restrictive license is not an 'administrative sanction.' " *Id.* at 318, 604 A.2d at 925. In support of that holding, we noted, in relevant part:

"Eligibility for modification of suspension or for a restrictive license becomes reality only if the driver meets the statutory prerequisites and, then, only if the [administrative law judge], in the exercise of discretion, finds modification of suspension or issuance of a restrictive license appropriate. It is inconceivable that the Legislature intended 'sanctions' to include advice concerning a mere potentiality.... [T]he possibility that the suspension will be modified or a restrictive license issued is only that—a possibility, a mere potentiality."

*Id.* (citations omitted).

We pointed out a number of problems inherent in attempting to give advice as to possibilities, including the prospect of actually misleading the person. We therefore construed the word "sanctions" as referring only "to an outcome that is certain to happen," namely, the length of the suspension for refusing the test or taking it and having it show a BAC of 0.10 or more. *Id.* at 320, 604 A.2d at 925. We confirmed that view, against a due process attack, in the companion case of *Hare v. Motor Vehicle Admin.,* 326 Md. 296, 604 A.2d 914 (1992).

Following our decisions in *Chamberlain* and *Hare*, the Legislature made two additions to § 16–205.1 relevant to the issue raised by Meanor. In 1993, it reacted to those cases by adding to § 16–205.1(b)(2)(iii)—the subsection dealing with the advice to be given by the officer—a requirement that the advice include "ineligibility for modification of a suspension or issuance of a restrictive license." *See* 1993 Md. Laws, ch. 407. In *Forman v. Motor Vehicle Admin.,* 332 Md. 201, 218 n. 8, 630 A.2d 753, 762 n. 8 (1993), we construed that amendment as requiring officers "to specifically advise suspected drunk drivers that the suspension for refusal to take an alcohol concentration test is mandatory," and we presumed that the DR–15 form used by law enforcement agencies "will be amended accordingly." It was.

The second change of significance came with 1998 Md. Laws, ch. 526, the major thrust of which was to expand the Ignition Interlock Program and authorize MVA to impose an alcohol restriction that prohibits the licensee from driving or attempting to drive a motor vehicle unless the licensee is a participant in that program. The provision for that restriction was authorized by an amendment to § 16–113(a), dealing with conditions that may be attached to the *issuance* of licenses, and by additions to § 16–205.1(n), dealing with the authority of MVA to *modify the suspension* of a license. Subsection (n)(2), which applies only if the licensee did not refuse to take the test, was amended to allow MVA to add as a condition to a restrictive license a restriction that prohibits the licensee from driving or attempting to drive unless the licensee is a participant in the Ignition Interlock Program. An amendment to subsection (n)(3) and the addition of a new subsection (n)(4), for the first time, allows MVA to modify a suspension or issue a restrictive license to a person who *refused* to take the test if the person participates in the Ignition Interlock Program. Thus, under the 1998 Act, if the licensee participates in the Ignition Interlock Program, MVA may modify a suspension or issue a restrictive license whether the licensee refused the test or took it and showed a BAC of 0.10 or more.

The problem, for Meanor, is that, in making conforming amendments to § 16–205.1(b)(2)(iii), which deals specifically with the advice required to be given to a person detained for driving while intoxicated or under the influence, the Legislature omitted to include any reference to subsections (n)(3) or (n)(4). As amended by the 1998 Act, subsection (b)(2)(iii) requires that the officer:

"Advise the person of the administrative sanctions that shall be imposed for refusal to take the test, including ineligibility for modification of a suspension or issuance of a restrictive license *under subsection (n)(1) or (2) of this section,* and for test results indicating an alcohol concentration of 0.10 or more at the time of testing."

(Emphasis added).

This amendment to subsection (b)(2)(iii), and similar amendments made to § 16–205.1(b)(3)(vii) 3. and (f)(7)(i) 3., changed nothing with respect to the required advice. For a test refusal, the officer must advise only as to the "administrative sanctions" that will be imposed. It is only with respect to a BAC test result of 0.10 (now 0.08) or more—the circumstance to which subsections (n)(1) and (n)(2) relate—that ineligibility for modification or restrictive license must also be disclosed. If the licensee refuses to take the test, the issue remains governed by *Chamberlain* and *Hare.* The prospect of a modification of the suspension or a restrictive license under subsection (n)(4) is a mere possibility and not a sanction. The test result was admissible.

## *CONCLUSION*

Our holding with respect to the jury instruction requires that the judgment entered on the conviction for driving while intoxicated be reversed and that that count be remanded to the Circuit Court for possible retrial. The error in the jury instruction does not affect the conviction for driving under the influence, however. Our conclusion that the test result was admissible renders that conviction valid. The trial court, quite properly, merged that conviction, for the lesser included of-

fense, into the greater, so no sentence was imposed on the driving under the influence conviction.

In order to avoid possible double jeopardy, collateral estoppel, law of the case, or other procedural problems, in the event that, notwithstanding that the sentence imposed on the driving while intoxicated conviction was only 90 days, all of which was suspended, the State elects to retry Meanor on the driving while intoxicated offense, we shall vacate the judgment of the Court of Special Appeals and direct that court to vacate the judgment of the Circuit Court and remand to that court for further proceedings in accordance with this Opinion. If the State elects not to retry Meanor for driving while intoxicated or if it elects to retry him on that charge and he is acquitted, the Circuit Court shall reinstate the conviction for driving under the influence and enter a proper sentence thereon. If Meanor is retried for driving while intoxicated and convicted, the court shall reinstate the conviction for driving under the influence but merge it into the greater offense.

JUDGMENT OF COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE JUDGMENT OF CIRCUIT COURT FOR HOWARD COUNTY AND REMAND TO THAT COURT FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY HOWARD COUNTY.